## KALAMAZOO ICE & FUEL CO. v. GERBER et al.

(Circuit Court of Appeals, Sixth Circuit. December 8, 1924. Rehearing Denied February 11, 1925.)

No. 4064.

1. **Evidence ⬳548—Testimony of expert as to value based on present recollection of commodity prices competent.**

Testimony of witness as to market value of coal on certain dates was competent, though he testified on basis of present recollection of market prices, and cross-examination showed he had no present recollection, where he was shown competent as an expert to testify from market quotations as to market conditions and prices.

2. **Sales ⬳174—Buyer's failure to punctually meet payments held not to excuse defendant's nonperformance, in view of correspondence between parties.**

Seller's further performance held not excused because payments had not been punctually made by buyer, where at conclusion of time limit both seller and buyer in correspondence indicated that neither wished to terminate contract.

3. **Sales ⬳150(1)—Seller's good faith in attempting to deliver buyer's pro rata share during car shortage is not measure of obligation.**

Under contract for sale of coal, good-faith effort by seller during car shortage to deliver buyer's pro rata share held not measure of his obligation.

4. **Sales ⬳85(2)—Provision for equitable adjustment in case of failure of timely delivery due to car shortage held not waiver of strict performance.**

Under contract for sale of coal, a provision that, if in event of car shortage timely delivery should be prevented, an equitable adjustment should be made held not a waiver of strict performance in every case of car shortage, but only in case seller's shortage in shipments did

not exceed prorating to which coal mine might properly subject him.

**5. Sales ⚖⇒176(1)—Buyer's demand for performance after time limit of delivery held waiver of past defaults.**

Under contract for sale of coal in specified quantities each month for three months, where, *during car shortage,* seller had not delivered contract quantities, buyer's demand for completion of contract, after time limit, and seller's telegram in reply thereto, *held* a waiver of buyer's claim for damages for past defaults, in the absence of other evidence showing a contrary construction by the parties.

**6. Sales ⚖⇒404—Buyer's rights on seller's failure to deliver specified installments of merchandise stated.**

Where seller failed to deliver monthly specified quantities of coal, buyer could have terminated contract and sued for breach, or could have insisted on performance as to later installments, reserving claim for past defaults, or could waive termination for default and damages therefor, but could not impose upon defendant a new and different obligation as to time of delivery in lieu of defendant's obligation to respond in damages.

**7. Sales ⚖⇒89—Where buyer after time limit demands completion except as to time, and seller assents thereto, contract is modified.**

Where, upon expiration of time limit, buyer demands specific completion of original contract except as to time, to which seller assents, original contract is modified to that extent.

**8. Sales ⚖⇒182(3)—Legal effect of correspondence between parties held for court.**

In buyer's suit for damages for seller's failure to complete delivery, the construction and effect of letters of the parties unexplained by other evidence of waiver are for the court to determine.

**9. Sales ⚖⇒99, 111—Where contract modified after seller's default, seller could terminate on buyer's failure to make payments; buyer's right to damages for default not reinstated by rescission by seller.**

Under contract for sale and delivery of coal in specified monthly quantities, where seller made only partial deliveries, but buyer waived default by insisting upon completion, except as to time limit, to which seller assented, the seller upon buyer's failure to make payments for subsequent deliveries as provided by contract was warranted in terminating the modified contract, and such termination did not restore buyer's waived right to damages.

In Error to the District Court of the United States for the Western District of Michigan; Clarence W. Sessions, Judge.

Action by Edward F. Gerber and another, copartners under the firm name of F. & R. Coal Company, against the Kalamazoo Ice & Fuel Company. Judgment for plaintiffs, and defendant brings error. Reversed and remanded.

Harry C. Howard, of Kalamazoo, Mich., for plaintiff in error.

Stuart E. Knappen, of Grand Rapids, Mich. (Knappen, Uhl & Bryant, of Grand Rapids, Mich., on the brief), for defendants in error.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

MACK, Circuit Judge. This is a suit for breach of contract by the buyer, the defendants in error, hereinafter called plaintiff, against the seller, the plaintiff in error, hereinafter called defendant, for the latter's alleged failure to deliver on time. The body of the contract in dispute, executed between the defendant and the plaintiff's assignor early in July, 1922, is printed in the footnote.[1]

---

[1] "(1) That the seller has this day sold and agreed to deliver and the buyer has this day purchased and agreed to receive and pay for three hundred (300) cars of coal, estimated to be in the aggregate fifteen thousand (15,000) net tons.

"(2) Said coal is to be delivered by the seller to the buyer f. o. b. cars at tipple of certain mines on the Norfolk and Western, or Chesapeake and Ohio Railroad Companies, and is to be standard Run-of-mine of merchantable quality and preparation. Said coal will be delivered by the seller as aforesaid, at the rate of approximately one hundred (100) cars per month beginning at once and continuing through July, August and September, 1922, or at the rate of about five (5) cars per working day, subject to the further provisions hereinafter contained. And for all coal delivered, the buyer shall furnish proper billing directions and shall pay for said coal at the rate of $3.35 per net ton of two thousand (2,000) pounds, all settlements to be made on the basis of railroad weights as furnished by the proper officials of the Norfolk & Western or Chesapeake & Ohio Railroad Companies.

"(3) The buyer has this day paid the seller the sum of twelve thousand five hundred ($12,500) dollars as an advance upon the purchase price of said coal, to be delivered as aforesaid, it being understood that the said sum of twelve thousand five hundred ($12,500) dollars paid as aforesaid is to be retained by the seller and applied as a credit to the buyer against any balance which may be due the seller at the completion of this contract. The buyer shall pay to the seller the sum of three dollars and thirty-five cents ($3.35) per net ton f. o. b. mines for all coal shipped on this contract in the following manner: For all coal shipped during the month of July, 1922, on which weights have been furnished the buyer prior to August 4, 1922, payment shall be made on the 5th day of August; for all coal shipped during July which is not paid for on August 5th and all coal shipped during the month of August, 1922, on which weights have been supplied the buyer on or before September 4th, payment shall be made on September 5th; on all coal shipped during the month of August, 1922, which was not paid for on September 5th and for all coal shipped during the month of September, 1922, on which weights have been furnished the buyer on or before October 4th, payment shall be made on the 5th of October. Provided, however, it is understood and agreed

At the time of the making of the contract the buyer knew that the defendant did not own or operate any mines, but was a dealer purchasing its coal from others. Buyer was not given the name, and did not know from whom these purchases were to be made. When the contract was made, the defendant had an option to purchase the coal required from the Williamson-Pond Creek Coal Sales Company, and exercised its option shortly thereafter. This company, too, was not a mine owner, but had a contract with the mines. It is contended by the defendant that at the time the contract in suit was entered into with the plaintiff's assignor the 6 mines from which the coal was to come were specifically mentioned and the contract was in effect a contract to deliver from specific mines. While there is evidence that the defendant had previously written the plaintiff's assignor the points from which the coal would be shipped, each point mentioned was served by several mines. Furthermore, plaintiff's representative, with whom the contract was negotiated, denied that a list mentioning 6 mines, or, as the defendant's representative testified, 7 mines, was shown him before the signing of the contract, but stated that the list showed 12 or 14 mines.

There was a strike of railway shopmen and trackmen in the summer of 1922. This had occurred or was threatened when the contract was made. A car shortage resulted as a consequence of the strike, and the price of coal rose. During the month of July, plaintiff received only 44 cars under the contract; during August, 43; during September, 28. It is admitted that defendant, in good faith, delivered all the coal it received under its contract with its vendor, although it could have purchased spot coal at the market for delivery under its contract with plaintiff.

There were some complaints by the plaintiff as to the amounts being shipped throughout the contract period, just as there were complaints by the defendant of the delay in payments. Neither party, however, as we read the record, indicated any intention of not going further with the contract, and defendant made no claim for damages because of the delay.

On September 26, 1922, the plaintiff wrote the defendant as follows:

"In checking over your shipments on contract for the month of September, am very much surprised to find that only eighteen cars have been shipped this month.

"We have a definite contract with you for 100 cars. We have received advices that the mines with whom you contracted produced over 100 cars in July and August, and more than 100 cars up to date this month, and the coal has been diverted that should have been applied on our 100 car shipments, causing us to go into the open market and purchase coal at much higher prices in order to fill our contract obligations.

"We now serve notice on you that we want our contract shipments completed, and we want you to see to it that this is done. You have orders for shipments which will take care of production for at least next week and we will keep you fully supplied with additional orders."

On September 29th the defendant wrote to plaintiff two letters. One of them reads:

"Please be advised that the mines have instructed us they will give us approximately ten cars to-day and to-morrow on your three hundred car contract.

"Also be advised that it is now possible to reconsign coal from the Portsmouth and Russell scales and all of your coal hereafter will be turned over on your order at the scales at Portsmouth and Russell. This will give you an opportunity to distribute the coal in accordance with your wishes. Kindly arrange to dispose of this coal upon its arrival at the scales and wire us any changes you desire in this respect."

The other letter calls attention to the equi-

---

that the twelve thousand five hundred ($12,-500) dollars advanced by the buyer to the seller shall be credited to the buyer's account on October 5th and applied against any balance due the seller at that time on account of coal previously shipped the buyer. It is provided further that, in event the full three hundred (300) cars or approximately fifteen thousand (15,000) tons has not been shipped on or before October 5th, then the twelve thousand five hundred ($12,500) dollars advance, or a sufficient amount of same to cover any shipments at that time due on this contract shall be retained by the seller pending the completion of this order.

"(4) It is understood and agreed, however, that, if by reason of car shortage, strikes, break-downs, acts of God, or other unavoidable causes, the seller shall be prevented from selling and delivering the quantity of coal herein provided for within the time and in the manner herein set forth, then and in such event an equitable adjustment will be made by the parties hereto as to the time in which said coal shall be delivered and accepted and the buyer shall not claim damages against the seller for any default occasioned by any of the causes aforesaid.

"(5) If the buyer shall fail or refuse to receive, accept, and pay for the full amount of tonnage as herein provided, then the seller shall retain as liquidation damages for such failure, the sum of twelve thousand five hundred ($12,500) dollars, or so much thereof as may be necessary to cover the loss occasioned by the seller by reason of such failure on the part of the buyer, this day advanced on the purchase price of the coal this day sold."

table adjustment clause of the contract and requests an expression "with respect to the delivery of the balance of this tonnage."

On October 3d the plaintiff telegraphed as follows: "Replying your letter September twenty-ninth regarding balance of coal due us under contract July fifth, our information is to effect that you were not prevented making delivery this balance by causes beyond your control and that you should have already delivered entire three hundred cars we propose hold you liable for damages sustained from your breach of contract if your Mr. Steirs desires discuss matter with us can see him in Pittsburgh Saturday morning this week advise if Steirs coming:"

The case was tried below before a jury and a verdict in favor of plaintiff returned for $25,965.37, including $2,667.52 admitted by defendant to be due plaintiff after crediting the $12,500 cash deposited by plaintiff as security for the performance of the contract.

The court left it to the jury to determine whether the contract related to 6 specified mines or not. The jury apparently determined that it did, and it was agreed on the oral argument that the jury's verdict might be so taken. As the verdict was based then on the construction of the contract advanced by the defendant on the trial, it is unnecessary for us to consider whether or not, if the contract were not so construed, defendant would be entitled to abate the deliveries required in relation to the car shortage along the railway lines specified in the contract or at the points of shipment mentioned in an earlier letter.

On defendant's theory that the contract related to the 6 mines specified, it was shown that plaintiff did not get the pro rata share of deliveries made by the 6 mines against outstanding contracts. Consolidation Coal Co. v. Peninsular Portland Cement Co., 272 F. 625 (C. C. A. 6). Defendant at the trial agreed, or at least made no objection, to the computation made by the court with the assistance of counsel for both parties from somewhat complicated data as to the deliveries to which plaintiff was entitled on such a prorating.

[1] Nor does the defendant's objection to the competence of the testimony of plaintiff's representative as to market value seem well taken. On direct examination he testified on the basis of a present recollection as to what the market prices were on various dates. Conceding that on cross-examination it was shown that the witness had no present recollection of the prices, he was competent as an expert to testify from market quotations as to market conditions and prices. Cliquot's Champagne, 3 Wall. 114, 18 L. Ed. 116; Jones v. U. S., 258 U. S. 40, 42 S. Ct. 95, 66 L. Ed. 399; Lewis v. U. S., 295 F. 441 (C. C. A. 1); Cleveland & Toledo R. Co. v. Perkins, 17 Mich. 296.

[2] Defendant's contention that it was excused from further performance because plaintiff had not made payments punctually according to the letter of the contract scarcely seems pertinent to the issues as tried below. Plaintiff was not complaining that defendant discontinued shipments at the end of September. The complaint was that theretofore the shipments had not been made as agreed. Assuming that defendant may have refused to make deliveries because of the delay in payments, there is no evidence that the contract had been terminated on this ground. Indeed, the correspondence between the parties down to the end of September indicates that, while both were dissatisfied—plaintiff with the amount of the shipments and defendant with the delay in payments—neither wished to terminate the order. Plaintiff, as late as September 26th, was serving notice to complete the contract shipments. Defendant on September 29th was writing to arrange for the rate of shipments after September.

[3, 4] The serious question in the case seems to be whether or not plaintiff, with defendant's assent, waived or extended the time for shipments just as the defendant did for payments, and whether or not plaintiff waived damages for the prior delays. The court below, in charging the jury, either overlooked this phase of the case, or, construing the written documents, must have decided that there was no waiver of damages. In the light of the pleadings, the contention of defendant, and its requests to charge, this is readily explicable. Defendant did not plead a waiver; its only request bearing thereon reads as follows: "The plaintiff (buyer) by an expressed provision in the contract waived any claim for damages because of failure to deliver all of the coal caused by a shortage in car supply. The evidence clearly establishes a shortage in car supply during the period of delivery. If you find from the evidence that the seller made a good faith effort to deliver the buyers' pro rata share during such car shortage, your verdict should be in favor of the defendant; that is, no cause of action."

This request was properly denied, inasmuch as a good-faith effort is not the measure of defendant's obligation. Furthermore,

"the expressed provision of the contract," the equitable time adjustment provision, is not in and of itself a waiver of strict performance in every case of car shortage, but only in case the seller's shortage in shipments does not exceed the prorating to which the mine may properly subject defendant; that is, if, notwithstanding a shipment shortage, defendant is not in default in the performance of its obligations. Nevertheless, the attention of the court was thereby called to the question of waiver; and, in addition thereto, in the exceptions taken to the charge as given, defendant among other grounds stated "that on the record no claim for damages for nondelivery of cars under the circumstances in the case should have been submitted." In our judgment, the interests of justice require us to determine whether or not, under the proper construction of the documents, the court erred, whether it be in assuming that there was no waiver in fact or in failing to consider the matter.

Plaintiff's letter of September 26th clearly indicates knowledge at that time of defendant's failure to make the pro rata shipments in each of the three months. True, the statement therein made is that the mines produced in each of these months over 100 cars, the maximum amount that defendant was obligated to ship to plaintiff; and the implication is that, if mine production exceeded the quantity specified, defendant was obligated to ship the 100 cars monthly. In this respect plaintiff was in error, as defendant's obligation within that maximum was to ship only the pro rata of the mines' production to which its vendor, as original contractor with the mines, was entitled. But as the proof showed, this pro rata in each month was far in excess of defendant's shipments.

[5, 6] As plaintiff continued in the letter, there was a diversion of coal; as against defendant, plaintiff was entitled to the coal diverted; that plaintiff erred in respect to the quantity wrongfully diverted is immaterial, because, believing the diverted quantity to be even greater than it actually was, plaintiff nevertheless demanded that the contract shipments, that is, not the undelivered September cars, but the undelivered part of the entire 300 cars, be made, and, as the last-quoted sentence of the letter shows, be made after September. So that, with actual information of the fact of diversion and with imputed knowledge of the legal right to terminate, on that account, any obligation to accept further deliveries, plaintiff waived the right of termination by demanding full performance in respect to quantity, a waiver that became effective at the latest when defendant wrote the letter of September 29th.

The question before us, however, is not that of the buyer's right to terminate, because in this case the buyer, not the seller, is the plaintiff. The question is as to the buyer's right against the seller for damages because of delays in shipments made before the waiver of any right so to terminate. We come then to consider what plaintiff's legal situation was at the time of this waiver. The binding effect of the equitable adjustment clause as to time of delivery was conditioned, as above stated, upon defendant's rightful, not upon its wrongful, shortage in deliveries; therefore, on September 26th, this clause, as a term of the contract, no more bound defendant thereafter to make shipments than it did plaintiff thereafter to accept deliveries in default. Apart therefrom, however, defendant's contractual obligation was not only to ship 300 cars in all, but approximately 100 cars in each of the three months. When defendant defaulted in any month, plaintiff could have terminated any continuing obligation to accept goods and have sued for the breach. It could alternatively have insisted on performance as to the installments for later months and have reserved its claim against defendant for the past defaults. Could it, however, also, apart from the equitable adjustment clause which we hold inapplicable as hereinabove stated, have insisted on defendant's completing, within a reasonable time, all past due as well as future deliveries, and in case of a later default become entitled to damages measured as of that later reasonable time? In our judgment it could not. The breach was complete at the end of each month during which the original default occurred. Plaintiff could waive such default so far as it affected its own right of termination. It could also waive it so far as it affected its own right to damages because of the breach, whether with or without consideration therefor we need not determine (see 2 Williston Contracts, § 704); but it could not impose upon defendant a new and different obligation as to time of delivery in lieu of defendant's legal obligation to respond in damages for the past breach. This does not mean that a seller has not only the power but also the legal right either to breach or to perform a promise; it means only that, if he commits a breach, the law and not the injured party, at least in the absence of some contractual provision, impos-

es and fixes the measure of the obligation to respond in damages therefor.

[7] If, however, on a buyer's demand for specific completion of the original contract except as to time, seller assents thereto, the original contract is modified to that extent. We recognize that in an installment contract buyer may accept subsequent installments, which the seller is under duty to deliver, without thereby binding itself to accept late deliveries of the earlier installments or waiving its claim to damages for the seller's failure duly to deliver the earlier installments. Williston Contracts, §§ 700, 864. We further recognize that the buyer may even accept a late delivery without waiving his claim for damages for delay in that very delivery. Williston Contracts, § 704. But the parties may by their words and action not merely waive or extend the time for performance; they may also waive the claim to damages for delay. Cf. Hartley v. Hymans, 1920, 3 K. B. 475. And, if seller's assent to the modification of the time element in the contract is based upon its reasonable understanding from buyer's words and conduct that buyer's right to damages is waived in consideration of such assent, then such waiver, based upon such consideration, is effective. Cf. 2 Williston Contracts, § 704.

In our judgment plaintiff's letter of September 26th, by its complete silence as to any claim for damages because of the diversion then believed by plaintiff to be even greater than it was, justified defendant in believing, not only that plaintiff wanted the balance of the 300 cars as soon as they could reasonably be obtained, but also that he waived any claim arising out of former alleged breaches. In these circumstances, and at a time when the market was still above the contract price, seller, by the letter of September 29th, assented to the extension. It is not to be assumed in the absence of clear evidence thereof that such assent, at a time when the market was above the contract price, and therefore involved a loss to the seller, was given without the belief that it thereby obtained a waiver of the damage claim. The evidence does not show that either of the parties then anticipated the decline that came after October 1st. Until October 1st, the correspondence clearly shows that both parties wanted and agreed that the balance of the 300 cars should be shipped within a reasonable time thereafter at the rate of 10 cars a day. True, defendant believed on September 29th, as shown by one of the letters of that date, that it was so entitled under the equitable adjustment clause, while plaintiff believed on September 26th, for some unspecified reason, that it could insist on completion of the delivery of the entire 300 cars. The difference between them as to the basis of their rights is immaterial. The letters, in our judgment, create the mutual right and obligation to deliver and to receive and pay for the balance of the shipments and the waiver of damages for the past breach.

[8] There is no evidence in this record of conduct apart from the letters themselves; their construction and effect were therefore for the court; if, as we hold, they created, in absence of any other evidence throwing light thereon, a waiver of plaintiff's claim for damages on account of defendant's past delays, then there could be no recovery on the first count for the delay, but only on the second count for the unused balance of a deposit made by plaintiff to secure the payments to become due.

[9] Defendant did nothing thereafter to affect this situation. Money due on October 5th was not paid by plaintiff because of the claim for damages and because the deposit exceeded the debt for shipments theretofore made. If, however, as we hold, the claim for damages was waived, and if, as we further hold, the deposit continued under the contract as modified to be held pursuant to the terms of the original contract as security for the future shipments, defendant was justified in demanding payments on October 5th and in terminating the modified contract on the following day. Such rightful termination did not restore plaintiff's waived right to damages.

Reversed and remanded.