221 F.2d 447
 AMERICAN VITRIFIED PRODUCTS COMPANY, a New Jersey
corporation, Appellant,
v.
E. H. WYER and Chris B. Hansen, d/b/a Wyer-Hansen,
Appellees, and Michigan Surety Company, a Michigan
corporation, Added Appellee.
 No. 12259.
 United States Court of Appeals, Sixth Circuit.
 Decided April 15, 1955.
 
 Alexis J. Rogoski and Robert Bunker Rogoski, Muskegon, Mich., for appellant.
 H. Winston Hathaway, Muskegon, Mich. (Edward C. Farmer, Hathaway, Latimer & Clink, Muskegon, Mich., on the brief), for appellees.
 Before SIMONS, Chief Judge, and ALLEN and MARTIN, Circuit Judges.
 ALLEN, Circuit Judge.
 
 
 1
 This is an appeal from a judgment in favor of plaintiffs[1] in an action to recover damages alleged to have been sustained due to delivery by defendant, American Vitrified Products Company, of defective sewer pipe and failure to make timely delivery of pipe for the construction of a sewer which plaintiffs were installing in the city of Roosevelt Park, Michigan, in 1951. In the fall of 1950 plaintiffs Wyer and Hansen agreed to form a joint venture for the purpose of bidding upon a contract with the city of Roosevelt Park, Michigan, for an extensive sewerage construction contemplated to cost over $500,000. In anticipation of securing this contract plaintiffs ordered from defendant, a manufacturer of vitrified clay pipe, different sizes of pipe in an order dated October 24, 1950. The contract with the city was awarded plaintiffs December 21, 1950. It provided for completion of the project December 31, 1951, but the time was extended by the city to April 30, 1952. The work was virtually completed around November, 1953.
 
 
 2
 On the same date that plaintiffs' contract was signed with the city the joint venture entered into a subcontract with E. H. Wyer, doing business as Wood Coal & Construction Company, whereby that company agreed to construct the Roosevelt Park sewerage system for the joint venture. Under the subcontract it was agreed that the joint venture was to furnish the sewer pipe which had been contracted for with defendant. It was also agreed that the joint venture should pay Wood Coal & Construction Company for the use of its equipment and for labor and material used in the sewer construction. Later, April 24, 1951, the joint venture agreement and the subcontract between the joint venture and Wood Coal & Construction Company were modified in a contract under which E. H. Wyer assumed individual responsibility for the performance of the joint venture's contract with the city of Roosevelt Park. The obligation of the joint venture to the city, to defendant for sewer pipe, and to furnish sewer pipe for the job remained unchanged.
 
 
 3
 It is conceded that on February 16, 1951, defendant's delivery of 4,620 feet of 18-inch pipe was rejected by the engineer for the city of Roosevelt Park upon the ground that it failed to meet the specifications of the contract between plaintiffs and the city; that on October 1, 1951, the 15-inch pipe delivered by defendant was rejected by the city engineer for the same reason; and that later during 1951 10-inch pipe and 12-inch pipe delivered by defendant were rejected by the engineer for the same reason. The pipe so rejected was returned to defendant. Plaintiffs were compelled to secure certain pipe from other sources at an advanced price and to use certain substitute pipe furnished by defendant after, in certain instances, considerable delay.
 
 
 4
 Plaintiffs contended at the trial that defendant, when it accepted the order for sewer pipe, was aware of the provisions of the contract with the city, the specifications and the requirement for completion by a date certain; that in their work schedule delivered to defendant's representative March 14, 1951, plaintiffs apprised defendant of their plan and order of operation; and that plaintiffs' plan and time schedule, which was that the 18-inch pipe should be laid first and completed before any of the smaller pipe was installed, were upset by defendant's breach of contract in furnishing defective sewer pipe not conforming to contract specifications and in failing to deliver and replace pipe on time. Plaintiffs' principal contentions were: (1) that the subcontractor was compelled, by defendant's causing delay in the construction, to lay sewer pipe in wet trench rather than in dry trench as planned; (2) that the subcontractor was forced to work under railroad tracks in highly inclement weather with a substantial increase in time necessary for this part of the operation; (3) that the subcontractor's equipment was not used for long periods of time, for which periods the plaintiffs were obligated to pay rental; (4) that the subcontractor from time to time had to idle his crews and shut down operations; (5) that the subcontractor had to replace defective pipe furnished by defendant at an increase in cost; (6) that equipment had to be moved unnecessarily because of the delay and irregularity of defendant's deliveries; (7) that additional labor was required with increase in cost. The principal defenses were: (1) that the joint venture suffered no damages; (2) that the special damages claimed were not within the contemplation of the parties when the contract was entered into and hence could not be recovered; and (3) that plaintiffs waived all damages for delay and delivery of pipe of defective quality by failing to object and by continuing to make payments to defendant upon accounts rendered.
 
 
 5
 The trial consumed five weeks and the transcript of the testimony covers eleven volumes. Fourteen claims for damages aggregating $103,315.43 were included in the amended complaint filed January 4, 1954, three of which, Claims 1, 10 and 14, were withdrawn from the jury by the court. The amount of these claims does not materially affect the aggregate total and they will not be discussed. Defendant filed a counterclaim for $28,436.02 with interest, which amount plaintiffs admitted was due defendant for pipe delivered. The court therefore instructed the jury to enter a judgment for defendant in the amount of $31,906.90. The jury rendered a verdict in favor of plaintiffs for $47,401.74, the net receipt of plaintiffs under the judgment being some $15,000.
 
 
 6
 The principal questions presented are questions of fact which were covered in detail by the court in its careful ruling on defendant's motion for summary judgment, in its charge to the jury, and in its ruling on the motion for judgment non obstante veredicto.
 
 
 7
 As to defendant's contention that the joint venture suffered no damages, the court in its elaborate findings on the motion for summary judgment, which are amply sustained by the record, finds and concludes that the joint venture between Wyer and Hansen, though modified on April 24, 1951, was not dissolved; that the joint venture at all times was obligated to defendant for sewer pipe purchased and to the city of Roosevelt Park for the construction of the sewerage system; and that defendant's breach of contract which increased the expense of constructing the sewerage system was a damage suffered by the joint venture. Gulf States Creosoting Co. v. Loving, 4 Cir., 120 F.2d 195.
 
 
 8
 The question whether special damages were recoverable presented a question of fact properly submitted to the jury. Where notice is brought home to the seller that the goods are purchased to be put to a particular use he is chargeable with the consequences for a failure to perform and with the results which such notice fairly apprised him would probably follow upon his breach of contract. Industrial Works v. Mitchell, 114 Mich. 29, 72 N.W. 25. Through its soliciting agent and representative Truesdale, defendant knew of the special use to which its pipe was to be put; that the city of Roosevelt Park was about to construct an extensive sewer system and prior to October 24, 1950, had prepared a contract and specifications covering the proposed construction. Plaintiffs were approached in September, 1950, prior to the submission of their bid, by Truesdale, who solicited an order on behalf of defendant for the necessary pipe. At that time Truesdale furnished figures representing the cost to plaintiffs of all pipe needed for the Roosevelt Park job and later prepared in his own handwriting an order for various sizes of pipe to be supplied plaintiffs by defendant. Truesdale got this information from the office of the city engineer. Knowing that the contract with the city had not yet been secured by plaintiffs, Truesdale inserted in the order a clause that it was to be fulfilled 'contingent upon signing of contract with owner.' From the evidence adduced the jury was justified in finding that defendant's agent was familiar with the specifications and provisions of the proposed sewer contract.
 
 
 9
 The special damages claimed were found upon ample evidence to be within the contemplation of the parties. Hence, under the established rule in Michigan and under the Michigan Sales Act defendant was liable for such damages proved to have been suffered as a direct result of delivery of defective pipe and delay in delivery of replacements, including loss of profits, overhead, cost of maintaining equipment in readiness, cost of extra labor, etc. Industrial Workers v. Mitchell, supra; Elco Shoe Manufacturers v. Thatcher, 231 Mich. 138, 203 N.W. 669; Michigan Uniform Sales Act, Section 69, M.S.A. Section 19.309, Comp. Laws 1948, § 440.69; Marquette Cement Mfg. Co. v. Campbell Construction Co., Inc., 6 Cir., 184 F.2d 352, 354; Grand Trunk Western R. Co. v. H. W. Nelson Company, Inc., 6 Cir., 116 F.2d 823.
 
 
 10
 The Marquette Cement Mfg. Co. case, supra, is particularly pertinent here. It covers a contract with the State Highway Commission of Arkansas to construct a concrete pavement. Damages claimed for non-delivery of cement were allowed. The defendant on appeal contended that the damages awarded were special damages not within the contemplation of the parties and not recoverable. The court pointed out that the defendant kept in touch with contract lettings for the construction of concrete highways, as its product was a principal ingredient of concrete. It stated, 184 F.2d at page 354:
 
 
 11
 'There was evidence tending to show that before the execution of the contract sued on Quarles had been advised of the nature of the contract between appellee and the Arkansas Highway Commission; of the character of the work to be done, of the plans and specifications; and of the 100 working day limitation upon its execution. In general, the damages sought were such as were incident to delay on account of the breach; on account of being compelled to keep on hand costly road building machinery and skilled labor with which to operate it, and of being forced at extra expense to complete the highway after the bad weather of the winter had set in.'
 
 
 12
 The Marquette case is closely in point with the instant controversy. Defendant here is a manufacturer of sewer pipe, having three plants devoted to manufacturing this one product, and having branch plants in Ohio, Michigan and Indiana. The prompt contact of Truesdale with plaintiffs after his obtaining the details of the city contract directly from the engineer was evidence from which the jury could rightly infer, as in the Marquette case, that defendant kept in touch generally with contract lettings for the construction of sewers in which its manufactured product was an essential requirement. See also Industrial Workers v. Mitchell, supra, which involved a government dredging contract. The seller of dredging machinery was sued and loss of profits was claimed because of delay in delivery. The seller had notice that the machinery was needed for the dredging contract. The court held that loss of profits from the government contract was an item within the contemplation of the parties.
 
 
 13
 This court in Grand Trunk Western R. Co. v. H. W. Nelson Company, Inc., supra (116 F.2d 839), considered an action brought by a contractor for recovery of special damages. The court in sustaining a substantial allowance for overhead expenses stated: 'When the present delay resulted, a part of the general expense of appellee's business was incurred in the supervision of the employees and the maintenance of the machinery and equipment on the job here in question * * *.'
 
 
 14
 As to defendant's contention that plaintiffs, by making no objections to various statements of account, waived such claims, this also presented a question of fact which was submitted to the jury under proper instructions by the court. The finding of the jury evidently in favor of plaintiffs upon this point is supported by ample evidence. As early as March, 1951, Wyer informed McKee, defendant's superintendent at Grand Ledge, Michigan, that this tie up was costing him money and somebody was going to pay for it. Repeatedly thereafter Wyer made similar complaints to McKee, to Brown, and to Truesdale. On November 27, 1951, Truesdale wrote defendant's office 'Understand, he (Wyer) thinks and I know some of this (the amount due for the pipe) would have been paid if he'd not been held up by tests and lost about six weeks work, when organization outgo was high and no revenue coming in from job to off-set this.' On December 14, 1951, Truesdale reported to defendant 'I saw Al Wyer today about his account, and he promised to send us a check the first of next week for as large a sum as he possibly could. He told me he was having a meeting that day with the city fathers to get some of the money they are holding back from him which in part at least they have now agreed to pay. Wyer stated this amounted to $17,000 and in part it can be blamed on pipe deliveries, because he hasn't been able to finish what he has started.' Brown, defendant's vice president in charge of sales, talked with Wyer in Cleveland on February 8, 1952. He said Wyer then stated in effect that some of the pipe was measuring short. The issue of waiver was rightly submitted to the jury.
 
 
 15
 The fact that plaintiffs subsequently accepted installments of pipe from defendant did not as a matter of law constitute waiver of their claim for damages for defendant's prior breach of contract. The pipe rejected was promptly returned to defendant. In the absence of acceptance or clear waiver it was a question of fact whether plaintiffs intended to surrender their claim for damages, Kalamazoo Ice & Fuel Co. v. Gerber, 6 Cir., 4 F.2d 235, and the jury resolved this point against defendant.
 
 
 16
 We deem it unnecessary to discuss in detail the numerous questions, all of which have been considered, raised by defendant in connection with its claim made on motion for directed verdict and renewed in the motion for judgment non obstante veredicto, that no evidence was presented supporting the judgment. A few typical situations will be briefly discussed.
 
 
 17
 It was shown that large quantities of expensive equipment, including two cranes, a bulldozer, ditch digger, an air compressor, a cement mixer, well point equipment, and certain trucks, with a replacement value of $142,818.40 were idled for considerable time. Other figures of replacement value are given but we quote the smallest figure. Truesdale admitted that one period of delay was for six weeks. The ownership cost of holding this equipment in readiness, figured on the basis both of actual cost and replacement cost, was computed from the manual issued by the Associated General Contractors of America, which does not include a profit to the contractor. This court has held it proper to use this manual in computing ownership costs to determine damages for holding equipment in readiness on the job. Grand Trunk Western R. Co. v. H. W. Nelson Company, Inc., supra.
 
 
 18
 As to increased cost from laying the pipe in wet trench it was shown that Wyer repeatedly discussed with Truesdale plaintiffs' plan for laying the pipe along the main track lines first and lowering the water level so that the smaller 8-inch pipe laid along the property line at lesser depth would be constructed in dry trench rather than in wet trench. The work schedule of February 14, 1951, specifically stated that the 18-inch pipe was to be delivered and laid first and thus strongly corroborated Wyer's statement that he informed defendant through Truesdale of this plan. The defective 18-inch pipe which was delivered constituted the full amount of 18-inch pipe contracted for. It was shown that defendant's delay of more than a month in delivering the requisite 18-inch pipe made it impossible for plaintiff to drain the trenches before laying the 8-foot laterals therein. The city engineer stated that the laying of these pipes in wet trench might cost from two to three times as much as in dry trench. 16,390 feet of pipe were laid in wet trench in this part of the operation.
 
 
 19
 Moreover, it was clearly shown that due to delivery of defective pipe and ensuing delay the sewer under the five railroad tracks of the Grand Trunk Western Railway had to be laid in subzero weather and that this resulted in the job taking 10 days more than would have been necessary for completing the construction in ordinary weather.
 
 
 20
 The case presents a mass of fact details properly submitted to the jury. A condensation of the 11 claims is printed in the margin.[2] Substantial evidence was introduced in support of all the claims not withdrawn from the jury. While this evidence was controverted it presented questions of fact and the court gave careful and detailed instructions in which we find no reversible error. The 450 pages of printed testimony given by Wyer were supported in material points by the testimony of the city engineer and by the mass of documentary evidence comprising detailed records kept in the ordinary course of business in plaintiffs' office or compiled from such records.
 
 
 21
 Defendant claims that the great majority of plaintiffs' exhibits were erroneously admitted. It lists in its brief 52 exhibits as improperly received in evidence but prints only 10 of these in its appendix. These exhibits have been carefully examined. Some of them were computations of items necessary to permit the jury to calculate plaintiffs' damages. Such computations are admissible. American Surety Co. v. Trenton State Bank, 323 Mich. 276, 283, 35 N.W.2d 260. They were made up from plaintiffs' records taken at the time on the job, prepared in the regular course of business, it being shown that it was the regular course of plaintiffs' business to make such a memorandum or record at the time of the act or event recorded or within a reasonable time. Section 1732 of the Judicial Code, 28 U.S.C.A. § 1732. The income earned by plaintiffs during periods in which they sought to minimize the damages from cessation of the job was given in detail.
 
 
 22
 Verified schedules and summaries may be admitted where books or documents introduced in evidence are multifarious and voluminous and of such character as to render it difficult for the court or jury to comprehend the material facts without schedules containing abstracts thereof. Defendant was given the fullest opportunity to examine such schedules, to compare them if desired with the original work sheets, vouchers, invoices etc., to prepare for cross-examination, but in general did not avail itself of the opportunity. Defendant's failure to cross-examine or to point out inaccuracies or falsities in many of the records received supports the finding of the jury.
 
 
 23
 on admitting various records the court cautioned the jury that it must consider them not as absolute proof of the facts set forth. A typical caution by the court was with reference to Exhibits 49-A, B, and C, a computation of wages paid by plaintiffs on work performed from February 6, to April 6, 1951, and a summary of expenses including the material used. The court stated that these exhibits were received 'not as conclusive proof relative to plaintiffs' claims, but merely as evidence which the jury may consider together with all other evidence when it comes to its deliberation of the facts in this case.' No reversible error is shown in the admission of exhibits nor in the instructions of the court during the trial and in the general charge with reference thereto.
 
 
 24
 Exhibits 66 and 66-A were copies of the detailed claims made in the complaint as amended January 4, 1954, and January 11, 1954. They were offered as exhibits for the convenience of the jury. As to Exhibit 66 the court cautioned the jury upon its admission that this exhibit 'is merely a statement of plaintiffs' claims; and is not a proof of the claims themselves. The only point of admitting it would be that it might be helpful to the jury as they consider these several claims and as they consider them as a whole * * * again I reiterate, it, is not proof. Do I make myself plain?' In the general charge the court repeated this caution, saying that 'plaintiffs' Exhibit 66 and 66-A purport to set out or be some itemization of their claims. I caution you that those exhibits are not proof of those claims. They are merely a statement of what the plaintiffs claim.' No error is shown in these statements of the court.
 
 
 25
 The 71 requests to charge proffered by defendant have been considered. The relevant portion of these requested charges, which constituted a proper statement of the law, was embodied in the final charge of the court.
 
 
 26
 The judgment of the District Court is affirmed.
 
 
 
 [1]
 The parties will be denominated as in the court below
 
 
 [2]
 Claim 2. Defendant delivered 18-inch pipe and 15-inch pipe in 3-foot lengths rather than in 4-foot lengths, resulting in a 25% increase in the cost of labor
 Claim 3. 5,360 feet of pipe delivered with an average shortage in length of 1 inch per 3-foot length.
 Claim 4. Cost of holding in readiness necessary equipment unused during the period from February 6, 1951, to April 6, 1951, calculated upon the basis of Associated General Contractors of America Schedule.
 Claim 5. Cost of holding necessary equipment in readiness unused during the period from September 26, 1951, to November 19, 1951, calculated upon the same basis as Claim 4.
 Claim 6. Difference in cost of laying 16,390 feet of 8-inch pipe in wet trench rather than in dry trench.
 Claim 7. Shutdown and cessation of work due to defendant's refusal to permit delivery of pipe May 7 and 8, 1952, based on ownership cost of equipment idled.
 Claim 8. Constructing pipe in underpass under five sets of railroad tracks in inclement winter weather, necessitated by delays caused by defendant requiring 10 extra days of work.
 Claim 9. Cost of replacement on ground of pipe rejected, during entire period of the job, by city engineer for hairline cracks, blisters, and heat checks.
 Claim 11. Well points retained on job 1 1/4 months additional by reason of delays caused by defendant and 5 months of extra time, effort and attention of subcontractor necessitated by delays.
 Claim 12. Loss of 5 months of use of equipment while such equipment was in use or held in readiness for use on Roosevelt Park Sewerage Project, preventing use of equipment elsewhere.
 Claim 13. Increased cost of pipe purchased because of failure or refusal of defendant to furnish pipe.