**8**

**HAMMEL–DAHL COMPANY, Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 1972.**

United States District Court
D. Rhode Island.

Dec. 31, 1957.

Edwin H. Hastings, of Tillinghast, Collins & Tanner, Providence, R. I., for plaintiff.

Joseph Mainelli, U. S. Atty., Arnold Williamson, Jr., Asst. U. S. Atty., Providence, R. I., for defendant.

DAY, District Judge.

Plaintiff, a corporation organized under the laws of the State of Rhode Island, has brought this action to recover a balance alleged to be due and owing to it under a contract for the manufacture and sale of 224 valves to the Atomic Energy Commission. Jurisdiction of this Court exists under the provision of Title 28 U.S.C.A. § 1346(2), the Tucker Act, so-called. Although the plaintiff claims there is due and owing to it the sum of $12,035.80, it seeks judgment in the sum of $10,000, the

maximum amount recoverable under the Tucker Act, plus interest and costs.

The defendant in its answer admits that all the valves called for by the contract were delivered, but avers that they were not delivered until long after the dates required under the contract between the parties, and counterclaims for damages alleged to have been sustained by it as a result of said delays in delivery. In its counterclaim it alleges that said contract required the plaintiff to commence deliveries on July 1, 1953 and to continue to make such deliveries at the rate of 15% of the total quantity of valves specified in the contract during each month thereafter until 224 valves were delivered; that no deliveries were made until January 1954; that as a result thereof the defendant, after utilizing all available valves similar to those to be supplied by plaintiff, was compelled to convert other valves to meet current construction requirements; that as a result of these conversions the defendant incurred excess costs in the amount of $14,796.58; that while there is due to the plaintiff under the contract by its terms the sum of $11,548.21, payment thereof has been withheld and applied in partial liquidation of the former's indebtedness in said sum of $14,796.58 and that there is justly due and payable to it the sum of $3,248.37 for which it seeks judgment.

At the outset of the trial the parties stipulated that the balance due plaintiff by the terms of its contract was $12,035.80 and the balance due the defendant, if its counterclaim is found to be valid, is $2,787.35.

From the evidence it appears that on October 20, 1952, the Atomic Energy Commission prepared and forwarded to six manufacturers of valves, including the plaintiff, an invitation to submit a proposal on a fixed unit price basis for the manufacture and delivery of Special Monel Control Valves in accordance with job specifications JS–280, Revision 7, JS–606, Revision 2, which accompanied the invitation. With respect to delivery dates of the valves the invitation stated:

"Deliveries are to start not later than July 1, 1953 and continue at the rate of fifteen per cent of the total quantity per month until completion of the order."

The invitation recited that the Carbide and Carbon Chemicals Company was assisting and acting as Agent of the Commission in the technical aspects of the procurement covered by the invitation and directed that questions concerning equipment characteristics, engineering designs and other matters be directed to Mr. J. O. Alexander, Carbide and Carbon Chemicals Company, Post Office Box P. Oak Ridge, Tennessee, and that a carbon copy of any such correspondence should be sent to the Commission.

The invitation also recited that:

"Because of the rather complicated and unusual nature of this equipment to be manufactured, the extensive quantity and the tight delivery schedule, you are cautioned to review thoroughly all of the data furnished herewith. We point out specifically that time is of the essence in this job and it is essential, therefore, that delivery schedules be met or bettered if possible."

This invitation was labelled by the Commission as "Inquiry G–202" and proposals in reply thereto were directed to be forwarded in time to reach the Commission not later than November 21, 1952.

The plaintiff, under date of November 20, 1952, submitted its proposal. However, it appears that the Commission thereafter modified its original Inquiry G–202, first on December 3, 1952, and again on December 10, 1952, and it became known as "Inquiry G–202 A". As late as January 16, 1953 plaintiff wrote to the Commission giving it a schedule of proposed prices for the items covered by the modified invitation and offering, subject to further negotiations, certain comments with respect to the form of contract to be executed by it.

Finally, on April 27, 1953, Contract No. AT(40–1)–1565 was executed, ef-

fective March 4, 1953. It called for the manufacture and delivery of 203 valves of various types and sizes. The provision as to deliveries thereunder appears as Article II of the contract. It reads as follows:

"The work hereunder shall be commenced immediately on execution of this contract and progress as rapidly as is practicable, it being understood and agreed that the Contractor shall begin deliveries by July 1, 1953 and shall continue deliveries thereafter at the rate of 15% of the total quantities of all valves per month until completion of delivery of all items under this contract. Said 15% may be composed of any size or type of valves ordered hereunder."

Plaintiff failed to begin to make deliveries on July 1, 1953. Despite its failure in this respect the Commission thereafter on July 6, 1953 and again on July 23, 1953 executed modifications of the contract whereby the number of valves to be made pursuant to the contract was increased from 203 to 224. Modification No. 1, executed July 6, 1953, provided that the 16 valves added thereby should be delivered by December 1, 1953. No other change in the delivery schedule was made by these modifications.

On July 6, 1953, plaintiff received written instructions from Carbide that the 203 valves, originally contracted for, should be shipped to it at Oak Ridge, Tennessee. These shipping instructions were modified by Carbide on July 24, 1953 by change notice No. 1 received by plaintiff on August 3, 1953 and plaintiff was thereby directed to ship a certain quantity of items to Carbide at Paducah, Kentucky, another quantity to it at Sargent, Ohio, and the balance to it at Oak Ridge, Tennessee. Instructions for marking the shipments were also given, and dates for the deliveries of various quantities and types were set forth; the last date for the deliveries of certain items being fixed as March 1, 1954. Further change notices followed.

Change notice No. 2, received August 24, 1953, simply increased the number of valves to be delivered from 203 to 224 as provided in Modification No. 2. Change notice No. 3, dated August 25, 1953, required that each item supplied should be marked with the identification number and change notice No. 4 which was issued January 19, 1954, and received by plaintiff on January 22, 1954, contained a revised acceptable delivery schedule, no deliveries having been made by the plaintiff through December 31, 1953.

It is clear that the plaintiff encountered production and supply difficulties from the very outset. Not only did it fail to make deliveries by July 1, 1953, but in spite of complete assistance and cooperation from Carbide, it was unable to make any deliveries prior to December 31, 1953.

Under date of September 22, 1953, the Commission acting through its Director, Contract Division, called plaintiff's attention to its default in deliveries and advised it that "Late delivery of valves may result in the Commission incurring additional handling expenses and other costs which we consider to be for your account." In reply thereto plaintiff wrote to the Commission expressing its regret at its inability to meet delivery requirements because of reasons beyond its control, and stating that Carbide expediters were well informed as to the difficulties being experienced. And later, on October 9, 1953, the Commission by another of its officials complained of plaintiff's non-performance and stated "Your failure to make delivery may increase the installation costs to the contractor for the Commission while further delay will seriously jeopardize the production schedule of material urgently needed for national defense". Finally, under date of December 30, 1953, the Commission, by its Director, Contract Division, notified plaintiff that although the statements regarding its default contained in the letters of September 22, 1953 and October 9, 1953 remain unaltered, the Commission would accept

valves from it under the contract if they were delivered in accordance with the schedule set forth therein. This schedule prescribed new dates for the delivery of the various types and sizes of valves and of quantities thereof. The first deliveries under this schedule were to be made by February 1, 1954 and the last by May 15, 1954. The concluding paragraph of this letter reads: "If you should fail to deliver any valves on or before the dates shown in the above schedule, we intend to immediately terminate for default such undelivered valves. Any excess cost to the Commission resulting from such termination will, of course, be for your account in accord with the terms of the contract." The new schedule of delivery dates set forth in this letter is the same as that set forth in change notice No. 4, dated January 19, 1954.

Plaintiff made its first delivery of valves on January 15, 1954 and complied in all respects with the new delivery schedule, completing the delivery of the 224 valves prior to the last date set in said schedule. All of the valves were accepted by the Commission.

On June 21, 1954, more than a month after the shipment of the last of the valves, the Commission by its Acting Director, Contract Division, notified the plaintiff that because of its late deliveries the Commission, in order to meet its construction schedule, was required to withdraw 125 valves from its spares stock. It further stated that it was necessary to convert 45 JS–280 type valves to JS–606 type valves and to change the action of 16 other valves. The costs of these conversions, it said, amounted to $17,393.09. It acknowledged that there was a balance of $11,090.30 due to the plaintiff on the contract price of the 224 valves, advised that this amount would be applied against said sum of $17,393.09, and that the Commission expected the plaintiff to remit to it the difference, that is, the sum of $6,302.79. Subsequently, on December 27, 1955, the amount claimed to be due the defendant was reduced to $3,248.37 and at the out-

set of this trial, as stated above, the claim was further reduced to $2,787.35.

It is clear that of the valves converted parts for the conversion of nine of them were ordered on June 27, 1953, the same date that Carbide issued its first shipping instructions to the plaintiff. According to the General Accounting Office certificate, the cost of these parts and of the conversion of said nine valves by Carbide was $2,925.38. The order for the conversion of 36 valves was placed by Carbide on December 15, 1953. The expense of this conversion amounted to $11,927.70. It does not appear when conversion of these valves was completed or whether they were installed in any project or added to the spares supply of the Commission. Nor is there any definite testimony that the delays of the plaintiff actually held up the work on any construction project.

Article VI of the contract incorporates a large number of "General Terms and Conditions" which were annexed thereto. Paragraph 10 of the General Terms and Conditions is entitled "Delay by Contractor; Default". This paragraph provides that the Government may by written notice of default terminate the whole or any part of the contract if the contractor fails to make delivery as specified and that in the event of such termination the Government may procure, upon such terms and in such manner as the Commission may deem appropriate, material similar to that to be furnished under the contract and that the contractor shall be liable for any excess costs for such material. Paragraph 10 also contains the following provision:

"(e) The rights and remedies of the Government provided in this paragraph shall not be exclusive and are in addition to any other rights and remedies provided by law or under this contract."

Despite the failures of the plaintiff to make deliveries as stipulated, the Government did not elect to terminate the contract in whole or in part. By its counterclaim it seeks to charge the plain-

tiff with costs of the conversions of the valves it claims were needed prior to their eventual delivery by the plaintiff. It claims that these costs constitute consequential damages caused by the plaintiff's breach of contract. The rule governing consequential damages which has now been generally adopted is that stated in Hadley v. Baxendale, 1854, 9 Ex. 341, 5 Eng.Rul.Cas. 502 in the following language at page 504:

"* * * If the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate, would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances so known and communicated. But, on the other hand, if these special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases, not affected by any special circumstances, from such a breach of contract * * *."

The same principle was followed in Globe Refining Co. v. Landa Cotton Oil Co., 1903, 190 U.S. 540, at page 543, 23 S.Ct. 754, at page 755, 47 L.Ed. 1171, where the Supreme Court held:

"It is true that, as people when contracting contemplate performance, not breach, they commonly say little or nothing as to what shall happen in the latter event, and the common rules have been worked out by common sense, which has established what the parties probably would have said if they had spoken about the matter. But a man never can be absolutely certain of performing any contract when the time of performance arrives, and, in many cases, he obviously is taking the risk of an event which is wholly, or to an appreciable extent, beyond his control. The extent of liability in such cases is likely to be within his contemplation, and, whether it is or not, should be worked out on terms which it fairly may be presumed he would have assented to if they had been presented to his mind."

See also American Vitrified Products Company v. Wyer, 6 Cir., 1955, 221 F.2d 447; Gulf States Creosoting Co. v. Loving, 4 Cir., 1941, 120 F.2d 195; The Thrasyvoulos, D.C.N.Y.1939, 28 F.Supp. 434; Marcus & Co. v. K. L. G. Baking Co., 1939, 122 N.J.L. 202, 3 A.2d 627; Section 330 of the Restatement of the Law of Contracts.

To entitle the defendant to recover on its counterclaim the burden rested upon it to establish by a fair preponderance of the credible evidence that the damages it seeks to recover and to use as a defense to plaintiff's claim were within the contemplation of the parties at the time of the execution of their contract. I do not think it has sustained this burden. It is clear that no notice was given to the plaintiff prior to or at the time of the execution of the contract that delays in deliveries might require such conversions to be made. Nor was plaintiff advised that the not unusual practice of installing valves after construction had passed beyond the point of installation would not be followed on the projects. Moreover, the plaintiff was not then informed as to the dates when any particular size or type of valve would be required for a particular project. In fact, it seems abundantly clear that neither the Commission nor Carbide had knowledge in April 1953 as to the dates when any particular types or sizes of valves would be needed.

And it was not until July 24, 1953 that Carbide, the prime operating contractor for the defendant, notified the plaintiff of the dates when it desired shipments of particular sizes and types of valves to be made. As pointed out above, the contract by its terms provided merely

for a percentage delivery each month to be satisfied by the delivery of any type or size of valve.

Even after the plaintiff was in default in its deliveries, the Commission in its letters of September 22, 1953 and October 9, 1953 made no mention of conversion costs that might arise from delays in deliveries. In my mind this is of no small significance for conversion costs had already been incurred by it on June 27, 1953. In my opinion the claiming of conversion costs is an afterthought which was not in the contemplation of the defendant and most certainly not within the contemplation of the plaintiff at the time of the execution of their contract. It cannot be said that at the time of the execution of the contract the parties contemplated, or it was reasonably foreseeable by the plaintiff, that such costs would be created or sustained by the defendant by reason of delays in deliveries. Such being the situation, they are not recoverable as consequential damages.

Moreover, I do not believe that the defendant has established by the required degree of proof that these costs were the proximate result of plaintiff's delays. In fact, part of said conversion costs were incurred prior to the date when deliveries were to begin under the contract. and prior to the placement by the defendant of orders for additional valves thereunder. Other conversion costs related to valves which were not shown to have been incorporated in any project prior to the receipt of similar valves from the plaintiff. The record is barren of any satisfactory evidence to indicate the ultimate disposition of these valves. And lastly, the claim for conversion costs includes the cost of converting types of valves never ordered from the plaintiff. In short, the evidence, both oral and documentary fails to establish that said conversion costs were the proximate result of the plaintiff's breach. The defendant is not entitled to recover on its counterclaim or to set off said conversion costs against the balance due under the contract to the plaintiff.

Plaintiff, having delivered all the valves required under the contract, is entitled to be paid therefor. However, this action, being brought under Title 28 U.S.C.A. § 1346(2), its recovery is limited to the sum of $10,000.

Judgment shall be entered for the plaintiff in the sum of $10,000, and in its favor on the defendant's counterclaim.