**OLIVER–ELECTRICAL MANUFACTURING COMPANY, Plaintiff,**

v.

**I. O. TEIGEN CONSTRUCTION CO.,
Defendant.**

**No. 4–57–Civ.–7.**

United States District Court
D. Minnesota,
Fourth Division.

Oct. 13, 1959.

L. V. Ackman, Vennum, Newhall, Ackman & Goetz, Minneapolis, Minn., for plaintiff.

Keith D. Kennedy, Youngquist, Comaford, Danforth, Fassett & Clarkson, Minneapolis, Minn., for defendant.

DEVITT, Chief Judge.

Plaintiff, a Michigan manufacturing corporation, instituted this action to recover $5,461.96, an unpaid balance due for goods sold and delivered. The defendant's answer admits the sale and delivery and admits the failure to pay the sum in question. The answer alleges a counterclaim for damages by reason of the plaintiff's failure to deliver the goods within the time agreed upon.

The defendant is an independent contractor engaged in the business of building electrical transmission lines. Early in 1956, defendant agreed to construct a transmission line for the Ottertail Power Company from Audubon, Minnesota to West Fargo, North Dakota. Under the terms of this agreement, construction was scheduled to begin on August 1, 1956 and to be completed by November 1, 1956. Orders for necessary materials were placed by defendant with various suppliers and manufacturers. Pole-line hardware was to be manufactured by the plaintiff and shipped to the job site in Minnesota.

Included in the hardware order was an item called a "spacer fitting," which consists of a piece of steel shaped somewhat like an "I." Spacer fittings are bolted into place at three points between two wooden planks which then form the cross-arms for the transmission line structures.

Teigen's construction operations consisted basically of four steps. In the first step, the cross-arms are "framed" by bolting the spacer fittings into place, and the completed cross-arms and poles are hauled to the line site. The next step is "field framing" by which the cross-arms are attached to the poles. This is followed by the "dig, set, and tamp" operation in which the structures are erected. Finally, the "wire stringing" operation completes the process.

The placement of the hardware order was accomplished by assignment of job orders to Wright-Sellers Co., then to Charles Ward Co., both manufacturer's representatives, and finally to plaintiff.

Prior to the final placement of the orders, representatives of Wright-Sellers Co. conferred with defendant concerning deliveries of the orders. Mr. Teigen, it appears, made it clear that materials must be on the job site in July so that he could satisfy his commitments to begin construction on August 1. Similar conferences with respect to time of delivery were held between Wright-Sellers Co. and Charles Ward Co.

On May 15, James Colwell of the Charles Ward Co. visited with plaintiff at his Battle Creek, Michigan plant. After discussing in some detail the general manufacturing problems which the job would entail, one of plaintiff's officers expressed confidence that plaintiff could manufacture the goods and deliver them when Teigen desired.

Immediately after accepting the job order on May 15, 1956, plaintiff wrote the defendant as follows:

"We want you to know that we are aiming for a shipping time on all of this material of early July.

"We are making detailed drawings of the steel spacer and X-brace hardware which we will forward within 3 or 4 days for your approval, and we also understand that of the subject power company. It would be appreciated if you would expedite these approvals as soon as possible in view of the *delivery requirements* on this material." [Emphasis supplied.]

In a letter dated the following day, May 16, the plaintiff added:

"In connection with all of your orders mentioned in our May 15th letter, may we call to your attention that we cannot enter a firm order until we have the destination on each of them and also a release for shipment. We would appreciate it if you could forward us these promptly therefore."

In reply, defendant wrote plaintiff on May 21, 1956 as follows:

"The destination on the above mentioned Purchase Orders will be Hawley, Minnesota. On all the orders, with the exception, of 1966M, we would like delivery not later than July 23rd and if possible, we would like to have delivery not earlier than July 9th."

The drawings for the hardware items were received by the defendant on May 24, 1956. They were returned on May 29, 1956 with instructions "to proceed with manufacture of them." On June 14, 1956, Teigen sent releases for shipment accompanied by a letter stating, "As stated previously, we would like to have delivery not later than August 1."

In a telephone call initiated by the plaintiff on or about July 10, 1956, defendant was informed that the first shipment of spacer fittings could be expected about the third week in August. In subsequent telephone conversations with plaintiff, the defendant and representatives of Wright-Sellers Co. repeatedly insisted delivery be made before August 1. The first shipment of spacer fittings arrived on August 16, 1956. On August 29, 1956 a second shipment was received. Further delays ensued when both shipments were returned to the plaintiff at Battle Creek after they were rejected by the Ottertail Power Company's engineers as being too brittle. The first shipment of usable spacer fittings arrived on September 11, 1956. Another shipment was accepted on September 17, 1956. Attachment of the spacer fittings to the wooden cross-arms began on September 25 and framing of structures began in early October. Work was carried on throughout the winter of 1956 and was finally completed in May, 1957.

The plaintiff's contention is that no specific delivery date was provided in the contract and that the plaintiff had only to deliver the goods within a reasonable time after the contract finally came into existence on June 18 when it received the releases for shipment. It urges that any statements concerning July delivery were made only in general

terms of a possible date that could be met if all details were "ironed out" quickly so as to leave it 45 to 60 days to manufacture the spacers.

█ In my view the evidence fails to support such a conclusion. Despite the plaintiff's preliminary statement that it could not enter a firm order until releases for shipment were submitted by Teigen, a contract appears to have come into existence when the plaintiff received approval of its drawings and the express authority to manufacture the items in the letter of May 29. The plaintiff reacted to this letter by immediately preparing its plant for manufacturing the items necessary to fill the order. Even if a binding contract did not come into existence until June 18 when Oliver received the releases for shipment, there were no intervening changes in negotiations indicating that July delivery was not an essential term of the contract.

A fair appraisal of the facts is that Oliver accepted the order knowing of the July delivery requirements but was under the impression that it was not an essential term of the contract. Its attitude is summed up in the statement of its president, "We give shipping promises regularly." In this case, however, knowledge was brought home to Oliver before the order was placed that Teigen had a contract to begin work on August 1 and that consequently, July delivery was a condition of the contract.

█ The plaintiff attempted to establish that in the electrical supply business there are certain customs by which a manufacturer is not liable for failing to meet designated delivery dates or for supplying defective materials as long as he acts in complete good faith or replaces the defective material as soon as possible. Whatever may be the traditional methods of businessmen in choosing not to assert their contract rights, it has never been supposed that continued failure to litigate could ever amount to a custom abolishing the fundamental right to damages for breach of contract. Cf. Stein v. Shapiro, 1920, 145 Minn. 60, 176 N.W.

54, 8 A.L.R. 1264. It appears that the custom referred to by the plaintiff is no more than the ordinary practice of compromising disputes without demand for special damages. As such, it is not entitled to be viewed as an implied term of the contract.

█ The plaintiff has also raised the issue of impossibility of performing the delivery requirements of the contract because a steel strike on July 1 delayed the plaintiff's acquisition of the steel necessary for making the spacers. Even under the liberal view tending to recognize great hardship as the equivalent of legal impossibility, see 4 Dunnell Minn. Dig. § 1789 (3d ed. 1952), the impossibility must arise from facts which the promisor had no reason to anticipate. Restatement, Contracts §§ 457, 467 (1932). The evidence clearly shows Oliver realized the contingency of a steel strike at the time of entering into the contract and therefore cannot be excused for late delivery on the ground of impossibility.

The plaintiff has raised additional issues. These questions are whether the defendant's laxness in asserting its claim for the delay constituted either waiver of the right to damages or failure to give notice of breach required by Section 49 of the Uniform Sales Act, Minn.Stat. Ann. § 512.49 and whether the acceptance of the replacements constituted an election of remedies.

The additional facts relevant to an understanding of these issues concern the sequence of communications between the parties from mid-July, 1956 until August, 1957 when this suit was brought. After a phone call to Mr. Teigen about July 10, advising him of a delay in the shipping date, Oliver confirmed the delay by a letter dated July 16. The defendant replied by letter on July 18:

"We have scheduled our construction to begin August 1st and it is imperative we have this material on the job site on or before August 1st to avoid costly delays."

Oliver answered on July 21st that the third week in August was the earliest delivery date possible at the time but that it would try to do better.

As soon as the spacers had been delivered on August 16, and had been found defective on August 27, Teigen's foreman called Oliver to advise it of the rejection and was told to return the defective spacers. Apparently no further communications were had between the parties until September when Mr. Teigen called Oliver to object that the replaced spacers were still defective. Mr. Teigen testified as to that conversation:

"Q. What did you tell him? A. The spacer fittings he shipped back, re-annealed and shipped back still did not meet the specifications and we were returning them; and that it was costing us a lot of expense, and I expected that Oliver Electrical was going to stand the cost of it. (Tr. 88)

\*  \*  \*  \*  \*  \*

"Q. Was anything of that conversation said concerning the delay, delivery? A. Yes.

"Q. What was said? A. I had told Mr. Daly (Vice-president of Oliver), reminded him of the delay that this had caused and that the expenses were incurring on it. Mr. Daly assured me we would be taken care of on the expenses." (Tr. 90–91)

Mr. Daly admits the conversation, but denies any content referring to expenses caused by delay.

After invoices for the material had been sent to the defendant, the next pertinent communication was a letter dated December 4, stating: "Since we have not heard from you we presume (the invoices) are in order and therefore would appreciate your remittance by return mail." Teigen made no reply, but remitted $5,089.54 on January 2, 1957.

About this time, either before or after the remittance, another phone call took place in which Mr. Daly admitted that:

"Yes, sir, Mr. Teigen observed that he was not exactly sure when he was going to pay the bill because he felt he had incurred some loss in connection with this transaction and he was not sure that he owed us sixteen thousand dollars. The implication, I understood, was that he owed us sixteen thousand dollars less whatever cost he felt he incurred."

Another payment of $6,097.26 was made on March 26, 1957. In April, 1957, a representative of the plaintiff visited Mr. Teigen who thereupon presented a claim of either $3,300 or $3,900. This was rejected by the plaintiff and suit was brought against Teigen.

On the basis of the above facts, Oliver contends that Teigen waived any alleged right to damages for delayed delivery by failing to specifically assert such a claim until an unreasonable time after the delivery.

■■ Waiver is a question of intention and must be manifested in some unequivocal way. Ohio Confection Co. v. Eimon Mercantile Co., 1923, 154 Minn. 420, 191 N.W. 910, 31 A.L.R. 952. There does not appear to have been any such intent on the part of Teigen to overlook the delay caused by the late shipment and the defective spacers.

Although the court in Minneapolis Threshing-Machine Co. v. Hutchins, 1896, 65 Minn. 89, 67 N.W. 807 states that the vendee must object to the delay at the time of accepting the goods, Teigen's letter of July 16 and his September phone conversation fairly satisfy this requirement.

Teigen's partial payment in January was accompanied by an assertion that the delivery delays had caused him extra expenses which made him hesitant about paying the whole bill. The present situation is thus different from that in Interstate Engineering Co. v. District of Columbia, 1940, 72 App.D.C. 152, 112 F.2d 214, where substantial payment and acknowledgment of the full debt without objection was held to be a waiver as a

matter of law. I find that the defendant did not waive his right to damages.

■ The plaintiff further contends that Teigen did not give notice of the alleged breach within a reasonable time as required by Section 49 of the Uniform Sales Act, Minn.Stat.Ann. § 512.49. But again, although Teigen's claim at first lacked preciseness and grew in articulation only with the passage of time, the plaintiff was made aware from July on that any delays in making usable spacer fittings available at the job site after August 1 would prove costly to Teigen, and after September it should have known in a general way that Teigen expected reimbursement for at least some of the costs involved. See American Vitrified Products Co. v. Wyer, 6 Cir., 1955, 221 F.2d 447, 451, Fairbanks, Morse & Co. v. Austin, 9 Cir., 1923, 288 F. 1, 2, for similar statements negating waiver and failure to give notice. I find that the defendant gave adequate notice of the breach.

■ The plaintiff during trial objected to the introduction of any evidence showing notice because Teigen's counterclaim had failed to plead it. The case of United States v. American Radiator & Standard Sanitary Corp., D.C.Minn.1953, 115 F.Supp. 422, was pointed out to the Court as holding that the notice required by Section 49 of the Uniform Sales Act, Minn.Stat.Ann. § 512.49, is a condition precedent to suit and must therefore be specially pleaded in order to state a claim for relief. However, Oliver did not move to dismiss for failing to state a claim for relief, and consequently did not properly raise this issue. The evidence was correctly received and considered.

■ The plaintiff also claims that the defendant's rejection of the defective spacers was a rescission of the contract, and its acceptance of the replacements constituted a recovery of the price under Section 69(1)(d) of the Uniform Sales Act, Minn.Stat.Ann. § 512.69(1)(d). The plaintiff argues that the defendant has therefore elected this as its sole remedy and cannot now sue for damages. The simple answer to this contention is that acceptance of replacements is not the same as recovery of a price which has been paid. The defendant has made no election which would bar it from recovering damages.

■ The plaintiff has introduced evidence that another supplier had the necessary steel and dies available and could have manufactured the spacer fittings within seven to ten days. It is asserted that the defendant's duty to mitigate damages therefore required that the defendant, upon being notified on July 10 of the certainty of late delivery, should have ordered the spacer fittings elsewhere. However, considering all the circumstances of the situation, the defendant's action in relying on the plaintiff's representation that the spacers were being produced as fast as possible, was completely reasonable and consistent with its duty to mitigate damages.

We come now to the question of damages.

The defendant in its counterclaim asserts that the plaintiff's delayed delivery of usable spacer fittings resulted in $41,784.60 increased costs for which the plaintiff should be held liable. These alleged damages arise from the additional number of days that were needed to perform the work when the delayed start prevented completion of the job in the fall and necessitated performance under the adverse conditions of winter and early spring.

The defendant's methods in computing these damages should be stated. It first reaches the conclusion, through an analysis of opinion testimony, that the initial delay and consequential winter construction caused 55 more working days to be required. The total cost of performing those construction phases which were affected by the delay is then computed at $121,555.48 and divided by the actual number of working days, 160, to reach a daily average cost of $759.72. The additional number of days required, 55, is

then multiplied by the average daily cost to result in the figure of $41,784.60.[1]

In the alternative, the defendant urges that as an irreducible minimum, the job was extended by the initial delay period of 31 working days from August 20 to September 25, and therefore resulted in additional costs of 31 times the daily cost, or $22,551.32. I cannot agree that either method should be used to fix the damages in this case.

■■■ The rule generally applicable in measuring the extent of liability for special damages is stated in Hadley v. Baxendale, 1854, 9 Ex. 341, 5 Eng.Rul. Cas. 502, 504:

> "Now, if the special circumstances under which the contract was actually made were communicated by the plaintiff to the defendant, and thus known to both parties, the damages resulting from the breach of such a contract which they would reasonably contemplate would be the amount of injury which would ordinarily follow from a breach of contract under these special circumstances, so known and communicated. But, on the other hand, if those special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract."

See also: Globe Refining Co. v. Landa Cotton Oil Co., 1903, 190 U.S. 540, 23 S.Ct. 754, 47 L.Ed. 1171; Appliances, Inc. v. Queen's Stove Works, Inc., 1949, 228 Minn. 55, 36 N.W.2d 121; Liljengren Furniture & Lumber Co. v. Mead, 1890, 42 Minn. 420, 44 N.W. 306, Restatement, Contracts § 330 (1932).

Here, there appear to be two separate factors contributing to the damages claimed. One is the initial cost of delay and the other is the additional cost caused by the necessity of winter construction. It seems clear from the evidence that the first element of damages can fairly be said to have been within the contemplation of the parties. The plaintiff knew at the time of contracting that the defendant had scheduled his work for August 1, and should be expected to have foreseen that delay in delivery of an essential part of the pole-line hardware would cause a suspension of the defendant's operations with the resulting expenses of idleness.

However, it is equally clear from the evidence that the special damages caused by winter construction were not within the contemplation of the parties at the time the contract was entered into.

In those cases which have allowed special damages for increased costs of performing a contract in adverse weather, the courts have been careful to show that the supplier at the time of entering into the supply agreement was acquainted with the work schedule and the contemplated completion date under the construction contract. American Vitrified Products Co. v. Wyer, 6 Cir., 1955, 221 F.2d 447; Marquette Cement Mfg. Co. v. Campbell Construction Co., 6 Cir., 1950, 184 F.2d 352; Gulf States Creosoting Co. v. Loving, 4 Cir., 1941, 120 F.2d 195; Hydraulic-Press Brick Co. v. Haynes Bread Co., 1915, 128 Minn. 401, 151 N.W. 140.

Here there is no evidence showing that Oliver knew the completion date was scheduled for November 1. There was evidence that power lines were sometimes planned for construction in the winter, so that it was not a matter of common knowledge in the industry that a contract beginning August 1 would always be scheduled for completion in the fall.

There is an additional factor which supports the conclusion that the in-

---

1. An alternate method of proof introduced by the defendant is that the plaintiff should be responsible for the difference between the "actual" cost of performance and the estimated cost, or $79,592.16. This figure has apparently been abandoned, but is used to support the reasonableness of the $41,784.60 figure.

creased costs of winter construction were not within the contemplation of the parties and should not be included in computing the special damages.

■ The damages which are "within the contemplation" of the parties are to be measured in terms of knowledge of the parties at the time of making the contract. Nevertheless, inferences may be drawn from subsequent acts of the parties as to the scope and extent of their original contemplation. Failure to refer to obvious elements of special damages after a breach has occurred thus remains relevant even though the Court has already found that there was no failure to give notice of the breach or waiver of the right to damages. Hammel-Dahl Co. v. United States, D.C.R.I.1957, 158 F.Supp. 8.

Except for a vague reference in April of 1957, Mr. Teigen never indicated that the plaintiff was responsible for the increased costs of winter construction until the counterclaim was entered. Mr. Teigen's general assertion in July of 1956 that late delivery would cause "costly delay" and again in September that "expenses were incurring" are more consistent with a reference to direct current costs than to the future costs of winter construction. Teigen's subsequent submission of a claim for approximately $3,500 in April of 1957, though perhaps partaking in an overture of compromise, is further cumulative evidence to support the conclusion that only the current costs of the delay were within the contemplation of the parties.

Even though this Court were to conclude that the increased costs of winter construction were within the contemplation of the parties, it is highly doubtful whether the plaintiff's breach was the proximate cause of such damages. The plaintiff showed that the defendant made claims against two other suppliers for defective materials on this job, one against the cross-arm supplier for $3,856.12, and the other against the pole supplier for $7,334.38, involving more than 975 man-hours of labor; further,

that other essential materials were still arriving as late as November, and that a machinery breakdown caused suspension of work for one week in October.

Mr. Teigen himself did not appear to have pushed his crews to optimum performance to complete the job in the fall. Although the records indicated that Teigen operated on a six-day week, the crews did not work on several autumn Saturdays when they were supposedly hustling to finish before winter. A comparison of the daily units produced in October with the rate of production in the winter shows no appreciable difference. Even though spacers arrived on August 16 and September 17, framing operations in each case did not begin until a week later.

■ On the evidence as a whole, I conclude that the increased costs of winter construction were not within the contemplation of the parties, were not the proximate result of the plaintiff's breach, and should not be included in the award of special damages.

■ Since the defendant's two methods of computing damages both involve the use of an average daily cost which necessarily includes the cost of winter construction, neither would be a correct measure of damages. The damages must instead be computed by itemizing those expenses incurred during August and September that are attributable to the late delivery of defective spacers. These would include the ownership expense of machinery for the number of days it was unnecessarily idle, wages for idle time or expenses in shifting workmen, fixed overhead during the delay, and the wasted expenses incurred in attempting to use the defective spacers. American Vitrified Products Co. v. Wyer, 6 Cir., 1955, 221 F.2d 447; Gulf States Creosoting Co. v. Loving, 4 Cir., 1941, 120 F.2d 195.

The first element of damages should be the labor costs incurred by Teigen in unloading and reloading the defective spacers and in framing and unframing thirty-six cross-arms upon which defective spacers were attempted to be used.

On the basis of the estimated time necessary to perform this labor, a fair compensation for this cost is $193.02, computed as follows:

Framing and unframing 36 cross-arms:

| | | |
|---|---|---|
| | 72 hours at $2.08 | $149.76 |
| Unloading and loading: | | |
| | 8 hours at $2.08 | 16.64 |
| | Total | $166.40 |
| Payroll tax and insurance at 16% | | 26.62 |
| | | $193.02 |

———◆———

The second element of damages should be the amount of fixed overhead fairly allocable to the period of delay. A reasonable estimate of this delay period is the 24 working days, excluding Labor Day, from August 20 to September 17, when no fruitful labor was performed on the job because of the absence of usable spacer fittings. According to the regular accounting records of Teigen Construction Co., overhead costs during 1956 were allocated to the Audubon-West Fargo job at 17.2% [2] in relation to the other jobs being carried on that year. The actual overhead for the year, $30,571.59, times 17.2%, or $5,258.31, is the amount of overhead thus allocable to this job. Of the 112 working days from August 20 to the end of 1956, the 24 non-productive days did not absorb their burden of the fixed overhead. The plaintiff should therefore be responsible for 21.4% (24/112) of the overhead, or $1,125.28.

The third element of damages should be the reasonable damages for ownership expense of the equipment idled by the delay. Although each piece of equipment did not appear on the job site until actually needed, the testimony of those connected with the job uniformly indicated that the necessary crews and equipment were available to start normal, heavy operations after August 20, so that presumably the equipment was idled for the period of the delay.

A problem is encountered at this point in ascertaining the reasonable damages for idleness of this equipment because the defendant's evidence runs only to its hourly rental value, thus including the cost of gas, oil and repair. The rental rates, when applied to the actual days the equipment was used on the job, were essentially relevant and consistent with the defendant's method of computing the total cost of performing the job and apportioning part of it to the plaintiff. However, as developed previously, the proper theory of damages in this case should assign only the direct cost of idle equipment to the plaintiff, and not the cost of increased usage caused by winter weather.

The hourly rental values introduced by the defendant must therefore be adjusted downward to reach a fair estimate of compensating for ownership expense during the period of idleness without the additional factor of direct costs for actual use. From the annual accounting records of the Teigen Construction Co. it appears that the total direct equipment expense charged to specific jobs during 1956 was $28,333.68 and that the general

2. The 1956 Job Operating Statement shows:

| | Overhead |
|---|---|
| 104 Cook-Trans. | $ 10,318.70 |
| Crookston-Bagley | 12,939.69 |
| 104 Cook-Gunflint | 3,476.51 |
| Audubon-West Fargo | 5,551.74 |
| | $ 32,286.64 |

The percentage allocation is thus:

| | |
|---|---|
| 104 Cook-Trans. | 31.9% |
| Crookston-Bagley | 40.1% |
| 104 Cook-Gunflint | 10.8% |
| Audubon-West Fargo | 17.2% |
| | 100.0% |

equipment overhead not allocated to specific jobs was $29,720.68. The ratio of these two figures supports the theory that the hourly rental rates, based on use of the equipment, could be halved to reach a fair estimate of the general ownership expense incurred when the equipment is idle.

Before dividing the rates in half, however, I believe that the rates themselves should be reduced. The rates were based solely on the opinion testimony of Teigen's foreman and were never supplemented by reference to a contractor's manual which the defendant had promised he would introduce. Cross-examination revealed that 50 cents an hour lower rates would also have been reasonable. Accordingly, the computation of damages for idle equipment is made as follows:

| Framing Equipment: | Hourly Rental Rate, Defendant's Exhibit | Reduced Rate |
|---|---|---|
| ½-ton truck | $ 2.00 | $ 1.50 |
| 2-ton truck | 5.00 | 4.50 |
| power wagon | 3.00 | 2.50 |
| 7½ ton truck | 7.00 | 6.50 |
| 1½ ton truck utility | 3.00 | 2.50 |
| Dig, Set & Tamp Equipment: | | |
| digger & half-track | 9.50 | 9.00 |
| half-track & crane | 10.00 | 9.50 |
| leveler & half-track | 10.00 | 9.50 |
| air compressor | 3.50 | 3.00 |
| 1½ ton truck | 2.50 | 2.00 |
| ½ ton truck | 2.00 | 1.50 |
| 1½ ton truck | 2.50 | 2.00 |
| 2-ton truck | 3.50 | 3.00 |
| | | $57.00 |

———◆———

$57 per hour times ½ equals $28.50; times 8 hours per day equals $228.00; times 24 days equals $5,472.00.

In this computation, no allowance has been made for idleness of the wire stringing equipment because the evidence does not support a finding that the wire stringing operation was ever directly affected by the delay. The crew and wire stringing equipment used on this job did not begin work until January of 1957, after finishing another job which was also late in being completed. One item, a three-quarter ton truck, has been eliminated from the defendant's exhibit enumerating the dig, set, and tamp equipment because the daily work sheets do not indicate that this item was used with any consistency in this operation.

The total damages that are ascertainable from the evidence as having been within the contemplation of the parties are therefore:

| | |
|---|---|
| Labor attributable to defective spacers | $ 193.02 |
| Overhead attributable to delay | 1,125.28 |
| Ownership expense of idle equipment | 5,472.00 |
| Total Damages | $6,790.30 |

I find that the defendant is entitled to recover damages of $6,790.30 less the unpaid balance owing plaintiff.

Defendant will please present findings in accordance with this memorandum.