PERFORMANCE ABATEMENT SER-
VICES, INC., Plaintiff/Counter–
Defendant,

v.

LANSING BOARD OF WATER AND
LIGHT, an administrative agency of
the City of Lansing and International
Fidelity Insurance Company, Defen-
dants/Cross–Defendants,

and

SCS Group, L.C., Defendant/Cross–
Plaintiff/Cross–Defendant/Coun-
ter–Plaintiff,

and

Lansing Board of Water and Light and
International Fidelity Insurance Com-
pany, Cross–Defendants/Cross–Plain-
tiffs.

No. 5–98–CV–70.

United States District Court,
W.D. Michigan,
Southern Division.

Aug. 6, 2001.

Jeffrey W. Bracken, Loomis, Ewert, Parsley, Davis, Lansing, MI, Ronald J. Garber, Shapiro, Fussell, Wedge, Smotherman & Martin, LLP, Atlanta, GA, for Performance Abatement Services, Inc.

Kenneth T. Brooks, Foster, Swift, Collins & Smith, PC, Lansing, MI, Anthony S. Kogut, Wilingham & Cote, PC, East Lansing, MI, Mary Dwyer, Lansing Board of Water and Light, Lansing, MI, Kevin T. McGraw, McGraw & Associates, East Lansing, MI, for Lansing Board of Water and Light.

Michael K. Lowman, Barbara G. Werther, Arent, Fox, Kintner, Plotkin, Washington, DC, Thomas H. Keating Jenkins & Keating, Grosse Pointe Farms, MI, David C. Gregory, Kelley Cawthorne, Lansing, MI, for SCS Group LC.

Philip G. Alber, Omar J. Harb, Alber Crafton, PLLC, Troy, MI, for Intern. Fidelity Ins. Co.

William E. Hartgering, JAMS, Chicago, IL, for VFM.

## *OPINION*

ENSLEN, District Judge.

This matter is before the Court on Defendants SCS Group, L.C.'s (hereafter "SCS") and Lansing Board of Water and Light's (hereafter "BWL") Motion to Dismiss Certain Claims without Prejudice, SCS's Motion for Partial Summary Judgment against Plaintiff Performance Abatement Services, Inc. (hereafter "PAS"), BWL's Motion for Partial Summary Judgment against PAS, PAS's Motion for Partial Summary Judgment against BWL, and PAS's Motion for Partial Summary Judgment as to SCS's counter-claims.

Each of these Motions has been opposed and briefed in accordance with the Local Civil Rules. Upon review of these Motions, and in light of the Court's familiarity with the issues garnered from past hearings in this matter and the extensive length of the current briefing, the Court determines that oral argument would not assist in nor expedite the resolution of these Motions. Accordingly, all requests for oral arguments as to these Motions are denied consistent with Local Civil Rule 7.2(d).

## *I. PROCEDURAL HISTORY*

This suit was filed by PAS on May 21, 1998 against Defendants SCS and BWL. Thereafter, SCS counter-claimed against PAS and cross-claimed against BWL; BWL then cross-claimed against SCS.

On December 4, 1998, the Magistrate Judge assigned this matter approved PAS's request to amend its Complaint. An Amended Complaint was thereafter filed which included claims against a bonding company—International Fidelity Insurance Company (hereafter "Fidelity"). The amendment of the Complaint also resulted in the later amendment to cross-claims and counter-claims which had been previously filed.

On December 7, 1998, this Court decided BWL's Motion to Dismiss, which resulted in an Order dismissing several of PAS's claims against BWL and some of SCS's cross-claims against BWL. The December 7, 1998 Order was clarified by Order of January 7, 1999.

By Order of April 3, 2000, the Magistrate Judge assigned this matter again allowed amendment to the pleadings. As such, PAS was allowed to file a Second Amended Complaint; Fidelity was allowed to assert amended cross-claims as well as third-party claims against Third–Party Defendants Robert Greenlees, Jerome Williams, Elizabeth Williams, and William Wysocki; BWL was allowed to amend its cross and counter-claims; and SCS was allowed to amend its counter-claims and to file a third-party claim against St. Paul Fire and Marine Insurance Company (hereafter "St. Paul"). These series of amendments resulted in the Third Case Management Order, dated June 8, 2000, which substantially rescheduled the discovery and scheduling deadlines in the case. The Third Case Management Order was later amended in part by two Orders granting Stipulations to amend. (*See* Dkt. Nos. 198 and 213.)

Facilitative mediation was conducted in this matter in December 2000. The mediation did not result in a complete settlement between the parties, but did result in a partial settlement agreement between SCS, BWL, Fidelity and a second bond company (Deerfield Insurance Company) entered into on January 24, 2001. This settlement agreement resulted in PAS bringing a Motion for Preliminary Injunction, Temporary Restraining Order and Constructive Trust, which asked the Court to take control of the settlement monies at issue. This Motion was heard on March 1, 2001. It was denied by Opinion and Order of March 6, 2001. The Third Case Man-

agement Order was then amended for a third time by Order of March 16, 2001.

As part of the previous motion practice, the Court discussed in its previous decisions the effect of the partial settlement. The Court previously concluded that those settlements were helpful in advancing this litigation. The Court also concluded that those settlements do not directly yield a conclusion that PAS is entitled to payment by SCS for unpaid work—since the payments were made for a variety of purposes including the responsibility of SCS to defend and indemnify BWL from further suit by PAS. The papers filed in connection with the instant Motions do not alter those conclusions.

These instant Motions were filed by the parties between May 1, 2001 and May 11, 2001. The Motions have now been fully briefed, after the parties received additional time for briefing.

Pursuant to a Stipulation of the parties, the Court ordered on July 9, 2001 that BWL's counter-claims against PAS be dismissed without prejudice.

## II. FACTUAL BACKGROUND

### A. Bid History and Expert Opinions

This tangled story involves the aspiring hopes of the City of Lansing's Board of Water and Light to remodel the Ottawa Station Development Project, a former power plant, by removal of various boilers, by abatement of asbestos and other dangerous substances, and by remodeling of portions of the plant. BWL informed potential bidders of the Project in 1995 and 1997 and conducted public walk-through meetings with potential bidders who wished to view the plant. As part of the bid process, BWL designed its "Specification," which informed bidders of the "nature and scope" of the work. The Specification did so in part by attaching very general construction drawings and by attaching asbestos laboratory test results (*i.e.*, samples were taken randomly from insulation throughout the plant and tested to determine if the insulation contained asbestos). The Specification, however, further indicated that BWL *had not* conducted a field survey for asbestos, that asbestos was located in most of the plant, and that bidders were responsible to survey asbestos themselves.

BWL's Specification was designed by Michael Ring. Michael Ring testified at deposition that he conducted the 1995 pre-bid walk-through with bidders and at the time informed bidders (as stated in the Specification) that further drawings of equipment and insulation were available for review at BWL's offices. (Ring Dep. at 65–66; Ring Affidavit of July 18, 2001, at ¶ 3.) His testimony contradicts the testimony of Edward Champagne (PAS's bidder) who has testified that he explicitly asked Ring for insulation plans and was told by Ring that no such plans existed. (Champagne Dep. at 38–93; Champagne Affidavit in Opposition to SCS ¶ 23; Champagne Affidavit in Opposition to BWL ¶ 12.) PAS has also pointed out that Ring's statement that he disclosed to all bidders that additional drawings were available for review at BWL's offices is questionable in that no additional bidders reviewed the drawings "on file" during the bidding process. (*See* Ring Dep. at 66.)

There were, nevertheless, many such plans and drawings to review in BWL's offices and the plant. The parties' several experts have examined the many plans and have asserted many and diverse opinions concerning the plans and conduct of the employees of the parties in the bidding process. The following statements are a brief summary of those many opinions: Richard Jenkins, one of PAS's experts, has opined that of the thousands of drawings which did exist, there were some 36 drawings depicting insulation which, had they

been disclosed in the listed drawings, would have disclosed to PAS most, if not all, of the asbestos which PAS claims was "hidden" from it. (*See* Jenkins' Affidavit ¶ 22 and attached papers.) One of SCS's experts, George Robinson, has opined that most, if not all, of the asbestos for which PAS seeks additional compensation was indicated to PAS in drawings available at BWL's plant and offices and would have been obvious from a visual inspection of the plant given the nature of the equipment. (*See* George Robinson Decl. ¶ 5i and Robinson Report at 28.) Edward Champagne has also opined that the additional asbestos was not disclosed in the *listed* drawings, was not apparent from his visual inspection, and would not have been apparent to a reasonable bidder from a visual inspection. (*See* Affidavit of Edward Champagne in Opposition to BWL ¶¶ 22–26.) James Werner, another of PAS's experts, has opined that the disclosures by BWL/SCS were inadequate to disclose "hidden asbestos" and were inadequate disclosures in light of BWL's duties under health and safety regulations. (*See* Werner Affidavit and Report.) Michael Tillotson, an expert for BWL, has opined that BWL sufficiently complied with occupational health and safety regulations for the disclosure of asbestos at the work site by the disclosures made by BWL. (*See* Tillotson Decl. ¶ 5.)

### B. Contract, Specification and General Requirements

BWL awarded the contract to SCS in the fall of 1997 (which award assumed BWL's use of PAS as the asbestos subcontractor). Article I of the Contract stated that SCS would perform the services and provide the materials described in the attached Specification in exchange for payment of $2,686,000.00. It also indicated that the "Specification, General Requirements, Drawings and Addenda, if any, are made a part of this contract and are incorporated by reference as if fully stated." (Jerome Williams Declaration, Exhibit B, Contract, Article I.)

The Specification of BWL (which invited the bids) provided in pertinent part:

17. Owner's Information.

The Owner will furnish to the Contractor any design, manufacturer, operation or maintenance information available ... There is no guarantee as to the completeness of the information. . . .

The existing plant and equipment drawings are available for review at the Board of Water and Light. Copies can be made available as required to the successful bidder.

(*Id.* at Specification, § III, ¶ 17.)

The Specification, § V, ¶ 2 described the scope of work as including: the removal of energy production equipment (two 225,000 lb./hour steam boilers, three 275,000 lb./hour steam boilers, three 25 Megawatt steam turbines, one 4000 Kilowatt steam turbine and other assorted equipment specifically excluding a 2500 Kilowatt steam turbine and other property listed in section 8 of the Specification) and the "removal and disposal of all hazardous materials, fluids and solids." (*Id.* at Specification, § 5, ¶ 2.)

The Specification made the following statements as to asbestos:

1. General

The Contractor should be aware that Ottawa Station was an operating power plant from 1940 to about 1990. Most hazardous materials have been removed, except as noted in this Section. However, this list should not be considered complete. The Contractor should be aware that there may be other materials present but not specifically specified herein. Also, there may other small amounts of various hazardous materials

in the equipment, piping, and tanks even though the materials were removed. . . .

2. Asbestos

No asbestos survey has been performed. It is the responsibility of the Contractor to determine the extent of the asbestos to be removed. Asbestos thermal and electrical insulation and other materials are in most areas of the plant. The Contractor shall remove and dispose of all asbestos materials in all areas of the plant, including all areas which contain equipment which will remain property of the Owner. . . .

3. Refractory

The Owner has randomly tested the refractory in the boilers for asbestos. The results of the tests are attached to this specification. The sample numbers on the test results correspond to locations on the equipment and refractory in the plant. Locations 44 through 74 are marked on the equipment. There may be other asbestos containing refractory which has not been identified, and the Contractor shall take all necessary precautions during performance of the work.

(*Id.* at Specification, § VI, ¶¶ 1–3.)

Following the Specification document in the bid package was a legal document, General Requirements for Construction and Erection ("General Requirements"), which included 63 sections pertinent to the bidding and completion of this project. Pertinent sections of the General Requirements are explained below.

Section 6 of the General Requirements required bidders complete a site inspection:

6. EXAMINATION OF SITE

Bidder shall fully inform themselves regarding access to the site and work area, the conditions to be met at the site where the work will be done, and on other relevant matters concerning the work to be performed. Failure to take this precaution will not relieve the successful bidder from furnishing all material and labor necessary to complete the Contract without additional cost to the Owner.

Bidder also should examine drawing prints and other data if mentioned as being on file and available for reference of Bidder at [the] offices of [the] Engineer in Lansing, Michigan.

(*Id.* at General Requirements § 6.)

Section 10 of the General Requirements provided that the successful bidder assumed the risk of the work:

10. RISKS OF THE WORK

The Contractor shall carry on the work at his own risk and responsibility until it is fully completed and accepted by the Owner.

The work is to be made complete including any implied [work] that may have been omitted in the description of said work, but the use of which is implied or necessary, and shall be deemed to be included in this Contract. Such implied work shall be provided by the Contractor as if the same had been stated specifically without any additional charge to the Owner.

The mention of any specific responsibility or liability of the Contractor in this, or any part of the Contract Documents, shall not be construed as a limitation or restriction upon the general responsibility or liability imposed on the Contractor.

(*Id.* at General Requirements § 10.)

Sections 32 and 33 further described the drawings and specifications of the Contract, including the intended legal effect of their incompleteness:

32. DRAWINGS AND SPECIFICATIONS

The drawings, accompanying these specifications, are construction drawings

portraying the scope and intent of the work, the layout and structure of the coordinate physical parts, and the general arrangements of apparatus and equipment necessary to fulfill the purposes of the project.....

33. ENGINEER'S DRAWINGS AND SPECIFICATIONS

Any work indicated on the drawings and not particularly described in the specifications, or specified and not indicated on the drawings, shall be included by the Contractor, and the omission from both drawings and specifications of express references to any detail of work necessary and obviously intended shall not relieve the Contractor from furnishing the same without additional cost to the Owner.

The work shall be made complete including any implied [work] that may have been omitted in the description of said work, but the use of which is implied, and shall be deemed to be included in this contract. Such implied work shall be provided by the Contractor as if the same had been stated specifically without any additional charge to the Owner.

(*Id.* at General Requirements §§ 32–33.)

Also included within the General Requirements were sections relating to changed conditions and requests for additional payment:

46. CHANGES IN THE WORK

The Owner, without invalidating the Contract, may order extra work or may make changes by altering, adding to, or deducting from the work, the Contract Sum being adjusted accordingly. All such work shall be executed under the conditions of the original contract, except that any claim for extension of time caused thereby shall be adjusted at the time of ordering such change.

In giving instructions, the Engineer shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the work; but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Engineer stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

47. CLAIMS FOR EXTRA COSTS

If the Contractor claims that any instructions by drawings or other conditions involve extra cost under this contract, he shall give the Engineer written notice of such claim and in no event proceed with the work unless in pursuance of a written order from the Engineer stating Owner has authorized the change or in the event of an emergency endangering life or property. No such claim shall be valid unless so made.

(*Id.* at General Requirements §§ 46–47.)

### C. PAS's Subcontract with SCS

Subsequent to the entry of the Contract, SCS and PAS entered into a Subcontract dated January 7, 1998. (Williams Decl., Exhibit A.) The Subcontract was bonded by St. Paul on or about January 13, 1998. The Subcontract required PAS to complete those duties of the Contractor which were listed on Schedule A. (*Id.* at ¶ 2.) The Subcontract also required PAS to assume the duties of SCS as to the scheduled work: "SUBCONTRACTOR ... shall be bound to CONTRACTOR to assume the same obligations and responsibilities which CONTRACTOR must assume to Owner." (*Id.* at ¶ 5.) In exchange, SCS was required to pay PAS the sum of $1.298 million dollars. (*Id.* at ¶ 1.)

Schedule A listed a variety of activities relating to asbestos removal, foremost of which was the obligation for the "[c]om-

plete removal and legal disposal of all asbestos containing materials (ACM) on the site." (*Id.* at Schedule A ¶ II.A.) The Schedule also included the obligations to do "[a]ll work required to enclose, access, remove and transport ACM on the site" and "all testing, notifications, clearances, final cleaning and reports for ACM on the site." (*Id.* at ¶ II.B–C.) The Schedule excepted from removal flyash but only if the flyash was tested and certified by PAS as not containing ACM. (*Id.*) The Subcontract thus differed from SCS's prior proposal for flyash abatement-which had another company (Aqua Tech) responsible for flyash cleaning (instead of removal by PAS).

This Subcontract also contained a Schedule B—which was an Amendment to the original contract language. The Amendment expressed at paragraph 7 that "[n]either party shall be liable for special, incidental or consequential damages of any kind." (*Id.* at Schedule B ¶ 7.) However, it narrowed the paragraph 7 limitation at paragraph 5 so as to give PAS a greater right to recover these damages against SCS when caused by delay:.

5. Notwithstanding anything in the contract Documents to the contrary, including but not limited to Section 24, in the event Subcontractor is delayed in its work or is otherwise required to accelerate or resequence it work for reasons other than the fault of Contractor or others under Contractor's control, then Subcontractor shall be entitled to additional compensation to the same extent as Contractor. If, however, Subcontractor is delayed in its work or is otherwise required to accelerate or resequence its work due to the fault of the Contractor or others under Contractor's control, then Subcontractor shall be entitled to additional

compensation regardless of Contractor's right of recovery.

(*Id.* at Schedule B, ¶ 5.)

Furthermore, the Subcontract contained the following paragraphs pertinent to PAS's duties under the Subcontract:

6. Even if specific work set forth in the Contract Documents relating to SUBCONTRACTOR'S Work is not described in this Subcontract and/or every item necessary to perform SUBCONTRACTOR'S work may not be mentioned in the Contract documents, SUBCONTRACTOR shall still perform all work necessary to finish its scope of work, including all work normally construed to come within the scope of its activities as required of CONTRACTOR in the Contract Documents.

7. SUBCONTRACTOR .... warrants that it has received and reviewed all plans and specifications relating to its work.....

\* \* \* \* \* \*

23. No alterations shall be made in the SUBCONTRACTOR'S Work except upon written direction by CONTRACTOR. CONTRACTOR may, at any time, by written order and without notice to SUBCONTRACTOR's surety, make changes in the work contracted for and SUBCONTRACTOR shall proceed with the work as directed. If the changes cause an increase or decrease in the cost or time for performance, an equitable adjustment shall be requested in writing by SUBCONTRACTOR. Nothing hereon shall excuse SUBCONTRACTOR from proceeding with the prosecution of work as changed. SUBCONTRACTOR is required, however, to submit a list of pending change orders with its

monthly invoice. Failure to comply with this requirement will relieve CONTRACTOR of its obligation to adjust the contract sum or time for performance. No charges for premium time will be honored by CONTRACTOR unless signed work tickets have been obtained from CONTRACTOR.

24. SUBCONTRACTOR agrees to make any claims to CONTRACTOR for damages or additional compensation based on alleged extra work delays or changed conditions in the same manner as prescribed in the Contract Documents for similar claims by CONTRACTOR to Owner. CONTRACTOR shall not be liable to SUBCONTRACTOR for any claim until it is allowed by Owner. ANY PAYMENT OF ADDITIONAL MONEYS FROM CONTRACTOR TO SUBCONTRACTOR ARE CONTINGENT UPON PAYMENT FROM OWNER TO SUBCONTRACTOR. SUBCONTRACTOR hereby expressly waives any other right to damages or additional compensation. SUBCONTRACTOR shall also make no claim for delays or damages which it claims was caused by other subcontractors on the Project.

\* \* \* \* \* \*

28. SUBCONTRACTOR shall coordinate and check his work with all drawings. Where discrepancies are discovered, SUBCONTRACTOR shall be responsible to immediately notify CONTRACTOR in writing and request a clarification. If notification is not given, SUBCONTRACTOR shall be responsible for the required correction. Moreover, if SUBCONTRACTOR encounters any conditions upon which it may base a claim for extra compensation or time, it shall be its duty to give written notice to CONTRACTOR prior to commencing work involving this area. If no notice is given, SUBCONTRACTOR shall be fully liable for any and all expense, loss or damage resulting from this condition.

\* \* \* \* \* \*

34. THIS SUBCONTRACT SHALL, WHEN ACCEPTED BY SUBCONTRACTOR CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE PARTIES AND SHALL SUPERSEDE ALL PROPOSALS, CORRESPONDENCE AND/OR ORAL AGREEMENTS BETWEEN THE PARTIES.

\* \* \* \* \* \*

36. Any notice given under this Subcontract shall be in writing and sent by registered mail, telegram, or delivered personally to CONTRACTOR at SCS Group, 2642 Princess Avenue, Inkster, Michigan 48141.

(*Id.* at ¶¶ 6, 7, 23, 24, 28, 34 and 36.)

### D. Discovery of Asbestos and Correspondence

Of course, "additional" asbestos was in fact discovered in the boiler areas of the plant in early 1998 (on or about February 25, 1998) by a foreman for PAS in the course of his work. (*See* Champagne Affidavit of May 11, 2001, at ¶ 18; and letter of March 2, 1998.)[1] The "additional asbestos" discovered included: additional layers

---

1. Champagne's letter indicates that the asbestos was found on March 25, 1998, but this date is apparently mistaken in that the letter was itself dated March 2, 1998 and appears to have been sent by tele-facsimile on March 2, 1998.

of metal and insulation in the small boilers (boilers no. 1 and 2) and the large boilers (boilers no. 3, 4 and 5), additional asbestos in the burner boxes of the large boilers, additional asbestos insulation in the firebrick on level 6, and additional asbestos in covered wiring. Details concerning the "additional" asbestos are found in the correspondence of Edward Champagne to Robert Greeenlees of SCS. (*See id.* and other attached correspondence; Champagne Affidavit in Opposition to SCS ¶ 13 and attached correspondence). In addition to these "changed conditions," PAS has made other requests for payments regarding various conditions some of which are apparently unrelated to the asbestos abatement issues.

Discovery of added asbestos at the plant prompted PAS's project manager (Champagne) to write SCS on March 2, 1998 to inform SCS that PAS had discovered a second wall containing asbestos in the small boilers (boilers 1 and 2). (Champagne Affidavit of May 11, 2001 ¶ 18; Letter of March 2, 1998.) Champagne indicated in the letter that the discovery was a "changed condition" and that PAS would not proceed further without a written order. (*Id.*)

SCS apparently responded to this letter by indicated to Champagne, in a letter of March 30, 1998, that it deemed the "hidden asbestos" as covered by the Subcontract. (*See id;* Letter of April 1, 1998.) Champagne responded to the March 30, 1998 letter by his letter of April 1, 1998, which stated that PAS was willing to proceed with the work under protest but asked for a specific direction from both SCSand BWL to complete the work on the "hidden asbestos." (*Id.;* Letter of April 1, 1998 to Robert Greenlees.) SCS then sent a letter on April 13, 1998 to PAS, attaching a letter from BWL dated April 10, 1998, and requesting that PAS complete the work (without waiving SCS's rights or claims).

(*Id.;* Greenlees Letter of April 13, 1998; Ring Letter of April 10, 1998.) Many other letters were also exchanged between the parties concerning other "additional asbestos" and other "changed conditions" for which PAS was seeking additional payment. (*See* Champagne Affidavit of May 11, 2001, at ¶¶ 27–51; Champagne Affidavit in Opposition to SCS ¶¶ 13, 14, 22, 23 and attachments .)

### III. STANDARD FOR VOLUNTARY DISMISSAL

Defendants and Cross–Claimants SCS, Fidelity and BWL have moved to voluntarily dismiss without prejudice their claims against one another in accordance with their earlier partial settlement. This Motion is made pursuant to Federal Rule of Civil Procedure 41(a)(2). The Rule provides in pertinent part that:

(a) Voluntary Dismissal: Effect Thereof.

(1) By Plaintiff; by Stipulation. Subject to the provisions of Rule 23(e), of Rule 66, and of any statute of the United States, an action may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before service by the adverse party of an answer or of a motion for summary judgment, whichever first occurs, or (ii) by filing a stipulation of dismissal signed by all parties who have appeared in the action. Unless otherwise stated in the notice of dismissal or stipulation, the dismissal is without prejudice, except that a notice of dismissal operates as an adjudication upon the merits when filed by a plaintiff who has once dismissed in any court of the United States or of any state an action based on or including the same claim.

(2) By Order of Court. Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dis-

missed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper. If a counterclaim has been pleaded by a defendant prior to the service upon the defendant of the plaintiff's motion to dismiss, the action shall not be dismissed against the defendant's objection unless the counterclaim can remain pending for independent adjudication by the court. Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice.

FedR.Civ.Proc. 41(a).

■ This Rule is intended to allow for the liberal dismissal of claims, even after a counter-claim is filed, subject to the court approval to determine that no party is prejudiced thereby. *See Johnson v. Pharmacia & Upjohn Co.*, 192 F.R.D. 226, 228 (W.D.Mich.1999) (quoting *Templeton v. Nedlloyd Lines*, 901 F.2d 1273, 1274 (5th Cir.1990) *(per curiam )*). Whether to grant dismissal under Rule 41(a)(2) is a matter left to the district court's discretion. *See Garner v. Missouri–Pacific Lines*, 409 F.2d 6, 7 (6th Cir.1969). However, "a district court should [ordinarily] grant a motion for voluntary dismissal unless a defendant can show that it will suffer some plain legal prejudice as a result." *Waller v. Financial Corp. of America*, 828 F.2d 579, 583 (9th Cir.1987). "Plain legal prejudice" does not result simply because the defendant faces the prospect of defending a second lawsuit, *see, e.g., Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir.1994), nor does it result simply because the plaintiff may gain some tactical advantage in a future lawsuit, *see, e.g., Davis v. USX Corp.*, 819 F.2d 1270, 1275 (4th Cir.1987).

■ In its *Grover* decision, the Sixth Circuit identified four factors which a court should consider in determining whether to grant a voluntary dismissal: (1) the amount of time and effort the defendant has incurred in preparing for trial; (2) any lack of diligence on the part of the plaintiff in prosecuting the action; (3) the plaintiff's failure to explain the need for a dismissal; and (4) whether the defendant has filed a motion for summary judgment. *Grover by Grover*, 33 F.3d at 718.

## IV. ANALYSIS OF DISMISSAL MOTION

■ It is obvious and elementary from the above legal analysis that the Rule 41(a) analysis is intended to prevent legal prejudice to a party who has previously opposed a claim to be dismissed. In the instant case, the claims to be dismissed are not lodged by Plaintiff PAS, but rather concern SCS, BWL and Fidelity. PAS believes that its interests will nevertheless be impacted because the dismissal "will affect PAS's claims that are pass-through claims through SCS against the Board" and because "Fidelity has raised as a defense that PAS cannot be paid for its claims unless the Owner pays SCS." (PAS's Brief in Opposition at 3–4.)

As noted by the movants, these arguments are mistaken. PAS's claims are not in the nature of pass-through claims; they do not depend for their viability on the adjudication of the claims to be dismissed.[2] As for the argument that payment by BWL is a condition precedent for Fidelity's liability and that SCS may be preventing this condition from occurring, this argument does not prove "legal prejudice." If the argument be true, PAS could then assert in this litigation that SCS/Fidelity's conduct in reaching the settlement acted as a waiver or estoppel of the defense.

---

**2.** Also, as noted by SCS and BWL, the settlement agreement put in place an indemnification regime which strengthens, not diminishes, the likelihood that PAS will be reimbursed for any damages determined in this suit.

*See Dohanyos v. Prudential Ins. Co.,* 952 F.2d 947, 951 (6th Cir.1992) (holding that insurer may waive contractual defense by subsequent conduct).

Upon review of the factors stated in *Grover,* the Court determines that PAS will suffer no legal prejudice and that the Motion to Dismiss Certain Claims without Prejudice will be granted.

## V. STANDARDS FOR SUMMARY JUDGMENT

The instant cross-motions for summary judgment are brought pursuant to Federal Rule of Civil Procedure 56. Under the language of Rule 56(c), summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The initial burden is on the movant to specify the basis upon which summary judgment should be granted and to identify portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-movant to come forward with specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If, after adequate time for discovery on material matters at issue, the non-movant fails to make a showing sufficient to establish the existence of a material disputed fact, summary judgment is appropriate. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences are jury functions. *Adams v. Metiva,* 31 F.3d 375, 382 (6th Cir.1994). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548 (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505). The factual record presented must be interpreted in a light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule: "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995) (quoting Federal Rule of Civil Procedure 56(c)). Moreover, affidavits' must meet certain requirements:

> [A]fffidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

Fed.R.Civ.P. 56(e). The Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir.1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *id.,* unsworn statements, *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 968–69 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers,* 111 F.3d 1273, 1280 (6th Cir.1997), hearsay evidence, *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir.1996); *Wiley v. United States,* 20 F.3d 222, 225–226 (6th Cir.1994),

or bare legal conclusions, *Emmons v. McLaughlin,* 874 F.2d 351, 354 (6th Cir. 1989).

### VI. SUMMARY JUDGMENT ANALYSIS

This brings the discussion to the issues raised in SCS's Motion for Partial Summary Judgment against PAS, BWL's Motion for Partial Summary Judgment against PAS, PAS's Motion for Partial Summary Judgment against BWL, and PAS's Motion for Partial Summary Judgment as to SCS's counter-claims. The Court will discuss the Motions in that order.

### A. SCS's Motion for Partial Summary Judgment

SCS has moved for partial summary judgment as to the following counts of PAS's Second Amended Complaint: Count V (breach of contract); Count VI (innocent misrepresentation); Count VII (*quantum meruit*); Count VIII (breach of express warranties); Count IX (breach of implied warranties); and Count XI (reformation because of mutual mistake). In other words, SCS seeks summary judgment on all claims against it except for the claims in Count IV of the Second Amended Complaint (which are for breach of contract in non-payment of progress payments). SCS also seeks summary judgment across the various counts on its argument that PAS as to some of its supplemental claims failed to give notice of the claims. The Court will discuss the counts in their numerical order and will then discuss the notice argument.

### 1. Count V—Breach of Contract

SCS argues that is entitled to summary judgment as to Count V because the Count assumes that SCS had an obligation to reimburse PAS for the removal of additional, undisclosed asbestos and that this assumption is factually and legally mistaken. PAS contests this argument on several grounds.

First of all, PAS observes that Count V relates to a variety of damages other than the "additional asbestos removal." Indeed, a variety of other damages are pleaded at Paragraph 71 of the Second Amended Complaint. These other damages (as described in PAS's Response at 8 and the Affidavit of Edward Champagne at ¶ 14) relate to items separate from the asbestos removal—such as delay and losses allegedly caused PAS by SCS's "wrongful stop order" (letter) of May 20, 1998, water loss, Dowtherm evacuation, enclosure repairs, flooding, small boiler enclosure fire, and elevator shutdown. SCS's argument that the Complaint, at Count V, does not allege such losses is simply mistaken in that paragraph 71 sufficiently sets forth such claims especially in light of the liberal notice pleading requirements of Federal Rule of Civil Procedure 8(a). *See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 167–68, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Vector Research, Inc. v. Howard & Howard Attorneys P.C,* 76 F.3d 692, 697–98 (6th Cir.1996). Therefore, at best Defendant SCS's argument can only be granted in part—with respect to claims for additional payment respecting the removal of asbestos allegedly not contemplated by PAS.

Second, the issue of asbestos abatement must, because of the standard pertinent to summary judgment issues, be resolved in PAS's favor. While considerable pages could be devoted to an analysis of the contract language used, most of which favors SCS, this is unnecessary in light of the holdings in *Earl L. Reamer Co. v. City of Swartz Creek,* 76 Mich.App. 227, 256 N.W.2d 447, 450 (1977), *Hersey Gravel Co. v. Michigan,* 305 Mich. 333, 9 N.W.2d 567, 569 (1943), *Valentini v. City of Adrian,* 347 Mich. 530, 79 N.W.2d 885, 888–891

(1956), and *W.H. Knapp v. Michigan*, 311 Mich. 186, 18 N.W.2d 421, 426 (1945). Those cases require as part of Michigan law that a party which submits a project for bids has a legal duty to inform bidders of the nature and scope of work to be performed by giving bidders all relevant information on the project in its possession. *Earl L. Reamer Co.*, 256 N.W.2d at 450. Failure to comply with this duty has been treated as a breach of contract or implied warranty. *Hersey*, 9 N.W.2d at 569. Furthermore, the above cases do not permit a city or its contractor to circumvent the implied duty by contract language requiring the bidder to make its own inspections, requiring the bidder to assume the risk of non-discovery, or disclaiming the accuracy of the information.

SCS has raised any number of arguments in its various briefs that the Court should limit the holdings in the above cases so as not to apply to the current dispute. Those arguments, while good faith arguments for the modification of Michigan law, do not represent the rules of decisions in the above cases as applied by the Michigan Supreme Court. Since the task in a diversity case is apply the substantive state law as it would be applied by the state's highest court, *see Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3d 1126, 1130 (6th Cir.1995), these arguments must fail since the Michigan Supreme Court has repeatedly endorsed the principles set forth above and has shown no proclivity to narrow those principles as Defendant SCS suggests.

In this case, there is testimony from PAS's bidder that he inquired of Michael Ring of BWL at a pre-bid meeting whether there were more detailed drawings of insulation and was told by Ring that there were not such drawings. At that time, Ring admitted to knowing of the drawings and admitted knowing that they showed insulation which might detail asbestos, but has denied (at least implicitly) that Champagne ever posed those questions to him. Were a jury to believe Champagne over Ring, then it would be permissible to infer that BWL violated its duty to disclose superior knowledge. The jury could also infer from the violation of this implied duty that the contract limited the abatement of asbestos to the abatement of the disclosed asbestos and that SCS was legally required to make additional payments for changes as to the undisclosed asbestos.[3] In saying so, the Court is not recommending this point of view. The factual issue of which testimony is to be believed is complicated and interesting and one for the jury to decide.[4] As

---

**3.** Were the jury to reach this conclusion, it would be implicitly rejecting SCS's argument that the information required to be disclosed was within the "reasonable reach" of PAS, which would be a proper inference given the testimony of Champagne as to the "withheld" drawings.

**4.** On the one hand, Champagne's statement that Ring told him that there were no such drawings seems to be an all too convenient recollection intended to preserve his self-interest; it would have been particularly irrational for Ring to have said this when he knew such drawings were lying about in public view in BWL's offices and the plant. On the other hand, Ring's statements in his Affidavit of July 18, 2001 which denies the supposed conversation with Champagne are couched in "remembrance" rather than "fact"—reflecting either undue care in framing affidavits or undue experience in lying. (*See* Ring Affidavit of July 18, 2001 ¶ 3, stating that Ring "did not recall discussing the ... drawings ... with Champagne.... However, I do not believe that I would have told or represented to ... Champagne that drawings showing insulation did not exist....") Absent the unexpected (that Ring had this important conversation and has simply forgotten it), one of the two is lying under oath. This Court's opinion of perjurers is not far off that ex-

such, summary judgment must be denied as to Count V.

### 2. Count VI—Innocent Misrepresentation

Count VI of the Second Amended Complaint seeks damages for innocent misrepresentation by SCS. PAS has alleged that the Specification, drawings, and bid package which SCS passed on from BWL to PAS understated the extent of asbestos abatement. PAS further alleges that this false information caused it to make an artificially low bid, which inured to SCS's benefit.[5]

■ Under Michigan law, to prevail on a claim of innocent misrepresentation, a plaintiff must show that a false and material misrepresentation was made, that the plaintiff detrimentally relied upon the misrepresentation, and that the injury inures to the benefit of the person making the representation. *M & D, Inc. v. McConkey*, 231 Mich.App. 22, 585 N.W.2d 33, 37 (1998) (citing *United States Fidelity & Guaranty Co. v. Black*, 412 Mich. 99, 313 N.W.2d 77 (1981)). This is a specific kind of misrepresentation theory most *apropos* for cases involving parties in privity of contract. *Id.*

■ The evidence relied upon by PAS essentially consists of the affidavits and deposition testimony of Edward Champagne. Champagne states that he relied upon the bid architectural drawings in making measurements of the asbestos to be abated. (Champagne Affidavit in Opposition to SCS ¶ 19.) However, he further indicated in his deposition testimony that other than referencing lengths (as to which the documents were accurate) the general drawings "were really useless in quantifying asbestos"—so much so that Champagne discarded them after first seeing the drawings. (Champagne Dep. at 47–50.) More particularly, Champagne indicated that he completed his estimate of the quantity of asbestos based on visual inspection with other engineers and not based on the drawings. (*Id.* at 45.) This is a none too surprising result in that the drawings, as identified in the Specification and the testimony of Michael Ring, were very general architectural drawings, were not intended for asbestos abatement purposes, and were not to be used for that purpose.

On the evidence of record, a reasonable finder of fact could not find in PAS's favor because PAS did not detrimentally rely upon misrepresentations of SCS in bidding the project. Therefore, summary judgment shall enter in SCS's favor as to Count VI.

### 3. Count VII–Quantum Meruit

Count VII of the Second Amended Complaint states a cause of action for *quantum meruit*. SCS seeks summary judgment on Count VII under the rule stated in *Cas-*

pressed by Dante in Canto XXX of the Inferno (of the Divine Comedy): they belong in the Eighth Circle of Hell consumed by a fever of their own making.

5. As to the allegation of reliance upon false testing data, the only evidence suggesting reliance by PAS are the affidavits of Edward Champagne, which state the bare legal conclusion that Champagne relied upon the testing, but do not detail when, if at all, Champagne examined the testing data and how, if at all, it was used in advance of the bidding.

(*See* Champagne Affidavit in Opposition to SCS ¶ 23.) The making of such a bare legal conclusion is insufficient to avoid summary judgment. *See Emmons v. McLaughlin*, 874 F.2d 351, 355 (6th Cir.1989). This is particularly so when the precise manner of Champagne's bid preparation is detailed in his earlier deposition testimony: *i.e.*, he prepared his estimate based on his visual inspection and his measurements taken from the plans. Moreover, the testing data itself was accurate and clearly represented that it was not complete.

cade Electric Co. v. Rice, 70 Mich.App. 420, 245 N.W.2d 774, 776 (1976) that an express contract for services precludes the award of relief on *quantum meruit* (a contract implied in law to prevent unjust enrichment). PAS responded to the argument by noting the *quantum meruit* relief is still available to a party when the services at issue are outside of the contract.

■ While SCS makes its argument under the decision in *Cascade*, that decision in fact undermines its argument. In *Cascade*, the Michigan Court of Appeals also observed that *quantum meruit* recovery is available in the construction contract context in cases in which claims are made for "extras" not included within the contract. *Id.* at 776–778. Other Michigan cases have held the same. *See, e.g., Klas v. Pearce Hardware & Furniture Co.*, 202 Mich. 334, 168 N.W. 425 (1918); *Jarosz v. Caesar Realty, Inc.*, 53 Mich.App. 402, 220 N.W.2d 191, 193 (1974) and cases cited therein.

■ In this case, there is a genuine issue of material fact as to whether the additional services claimed were "extras" or were contemplated by the Subcontract. This issue depends in large part on the resolution of the related issue of whether an implied duty to disclose was breached (which breach may have the effect of limiting the Subcontract to the disclosed conditions and permitting *quantum meruit* recovery for extras). Liability on the issue of *quantum meruit* also depends on whether the written change order requirement (paragraph 23) of the Subcontract was met, waived or excused by conduct of SCS. *See Cascade*, 70 Mich.App. 420, 245

N.W.2d at 776; *Jarosz*, 53 Mich.App. 402, 220 N.W.2d at 193.

Accordingly, summary judgment is denied on this issue.

### 4. Count VIII—Breach of Express Warranty

■ Count VIII of PAS's Second Amended complaint seeks relief for breach of express warranty relating to the drawings and testing information attached to the Specification, which PAS asserts was expressly warranted by the statement in the General Requirements that the "drawings, accompanying these specifications, are construction drawings portraying the scope and intent of the work. . . ." (Jerome Williams' Decl., Exhibit B, Specification, General Requirements § 32.) PAS deems that the warranties were breached in that there was asbestos in areas of the plant not disclosed on the drawings and the testing. (*See* Champagne Affidavit in Opposition to SCS, ¶¶ 10 and 23, and attachments.) SCS deems that there were no express warranties in the Subcontract and Contract in light of the particular language used.

The snippet of language cited above by PAS is the only source of express contract language which could at all be construed as providing an express warranty to PAS as to the accuracy of the drawings. It is noteworthy that this language does not reference the testing data and cannot be reasonably construed as providing a promise as to the testing data.[6] However, even the notion that there was an express warranty as to the drawings falls away once it

---

6. Even were there such a promise, the testing data is not reasonably susceptible to an interpretation that it was providing a field survey of the plant. The testing data is on its face simply a list of areas of the plant from which insulation was removed and tested. There is no indication that the testing itself was inac-

curate even if additional asbestos has since been discovered. This is especially true since the Specification, Section VI, paragraph 2 states that no field survey has been conducted and that it is the responsibility of PAS to determine the extent of the asbestos in the plant.

is understood what was included in the drawings and what other contract language was used in the contract documents. As for the drawings themselves, it is evident from the previous discussion that they were not understood by the person preparing them (Michael Ring) nor the person relying upon (Edward Champagne) as even addressing the issue of the location of asbestos within the plant except in a very general way. Since skilled parties on both side of this conflict regard the drawings as "useless" from the standpoint of asbestos disclosure, a jury could not reasonably conclude that the drawings made express warranties about the location of asbestos in the plant nor the boilers.

Furthermore, these conclusions are strengthened by the fact that SCS/BWL made clear in the governing contract language that no such warranties were made and that PAS was assuming the risk of non-disclosure. Section 3, paragraph 17 of the Specification provided that "there is no guarantee as to the completeness of the information" and further indicated that plant and equipment drawings were available for review at BWL. (Williams Decl., Exhibit B, at Specification, § 3, ¶ 17.) Section VI, paragraph 2 of the Specification further provided that "no asbestos survey has been performed. It is the responsibility of the contractor to determine the extent of the asbestos to be removed. Asbestos thermal and electrical insulation and other materials are in most areas of the plant."

Section 32 of the General Requirements, which is the portion of the language excerpted by PAS, was a description of the information provided in the drawings and specifications (and was not made in the form of a promise). It also indicated that the information was "general" in nature. (*See id.*, Specification, General Requirements, § 32.) The following section then made clear that the work required under the contract included not only the work indicated on the drawings and specification, but also any "work necessary and obviously intended" as part of the project. (*Id.* at § 33.) Section 10 of the General Requirements further indicated that the "Contractor" (*i.e*, the subcontractor as to the subject of the subcontract) "shall carry on the work at his own risk and responsibility.... The work is to be made complete including any implied [work] that may have been omitted in the description of said work, but the use of which is implied or necessary, and shall be included in this Contract ... [and] shall be provided ... without additional charge to the Owner." (*Id.* at § 10.)

This Court's interpretation of the express contract language is determined as a matter of law. The instant contracts, which contained integration clauses, are unambiguous as to whether express warranties were to be extended to the testing data and drawings. *See Cloverdale Equipment Co. v. Simon Aerials, Inc.*, 869 F.2d 934, 941 (6th Cir.1989) (holding that in interpreting a contract "this court is not empowered 'to make a different contract for the parties or to look at extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning.'" quoting *Michigan Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64 (1941)); *Salzman v. Maldaver*, 315 Mich. 403, 24 N.W.2d 161, 165 (1946) (stating that, "[i]t is well established that where a written contract is clear and unambiguous, parol evidence of prior negotiations and representations cannot be adduced to create an express warranty and thereby vary the terms of the contract."). No such warranties were intended. The cases cited by PAS to the contrary are inapposite in that they deal with different contract language and different factual scenarios.

In light of the nature of the documents at issue, the multiple contract references which proclaimed loudly that warranties were not made, and the pertinent law, there are no genuine issues of material fact since a jury could not reasonably conclude that SCS had made an express promise as to the drawings and testing which has been breached. Accordingly, summary judgment shall issue on Count VIII in favor of SCS.

### 5. Count IX—Implied Warranty

Count IX of the Second Amended Complaint states a claim against SCS for breach of an implied warranty under the Subcontract that the underlying drawings, Specification and test results were· adequate for their intended purpose of determining the quantity of asbestos to be abated. SCS argues in its Motion for Summary Judgment under the federal case of *United States v. Spearin,* 248 U.S. 132, 136, 54 Ct.Cl. 187, 39 S.Ct. 59, 63 L.Ed. 166 (1918) that no implied warranty attaches to a construction contract specifications *unless the specifications relate to the design or construction of a project.* Since the instant project involved "performance specifications" to eliminate "all asbestos" and not design specification, SCS concludes that summary judgment is warranted. SCS also argues that any implied warranties were disclaimed in the contract language. PAS's answer to this argument is that Michigan law does not recognize the rule announced in *Spearin* and that the contract language disclaimers herein were ineffective.

PAS is correct that the authorities cited by SCS interpret either federal laws or the laws of states other than Michigan. Since this case involves Michigan law, the decisions of its Supreme Court are deemed controlling. As this Court has already mentioned with respect to Michigan law, Michigan law implies in every construction contract a duty to inform bidders of all material information pertinent to the bid. *Earl L. Reamer Co.,* 256 N.W.2d at 450; *Hersey,* 9 N.W.2d at 569; *Valentini,* 79 N.W.2d at 888–891; *W.H. Knapp,* 18 N.W.2d at 426. The Michigan courts have deemed this implied warranty made even if express contract language is inserted in the contract seeking to avoid and disclaim warranties and to require the bidder make its own inspection. *Id.* Furthermore, the Michigan Supreme Court in *Valentini* cited the decision in *Spearin,* not for the proposition that implied warranties are only made in design specification cases, but rather for the proposition that contract language requiring a contractor to make a site visit did not waive liability for non-disclosures. There is no indication in Michigan law that the *Spearin* case, as explained by SCS, is followed and such a rule would be inconsistent with the general tenure of the decisions cited above—which require full disclosure by public entities of known conditions regardless of the form of the contract. As such, summary judgment will be denied SCS on Count IX.

### 6. Count XI—Reformation/Mutual Mistake

Count XI of the Second Amended Complaint seeks reformation of the Subcontract because of mutual mistake so as to require SCS to compensate PAS an additional $118,000 for the removal of flyash from the plant. SCS argues that PAS has not submitted evidence of mutual mistake in support of this claim.

This Subcontract explicitly required the removal of all asbestos-containing materials ("ACM"). It specifically excluded flyash, but *if and only if* the flyash was "tested and certified by PAS to be non-ACM." (Williams Decl., Exhibit A, at Subcontract, Schedule A § III.A.) The only evidence cited by PAS of mutual mistake are the contract documents (which

themselves do not show mutual mistake) and the affidavit of Edward Champagne. (*See* Champagne Affidavit in Opposition to SCS ¶¶ 20–21.) Champagne says that PAS originally bid the job as not including flyash removal (the bid proposal by SCS originally proposed flyash cleaning by Aqua Tech). (*Id.* at ¶ 20; PAS Bid Proposal § 4C.) Champagne, however, acknowledges that this proposal was not accepted (the final subcontract requiring flyash removal by PAS). (Champagne Affidavit in Opposition ¶ 20.) PAS by its vice-president, Paul Settles, then approved the subcontract and he has not asserted his mistake in making the approval.[7] There is also no assertion of mistake by SCS nor of inequitable conduct relating to SCS as to this provision of the Subcontract.

 Reformation on the ground of mutual mistake under Michigan law requires proof that both parties were mistaken as to the contract terms or that one party was mistaken and the other party acted fraudulently or inequitably. *See Mate v. Wolverine Mut. Ins. Co.*, 233 Mich.App. 14, 592 N.W.2d 379, 384 (1998); *Olsen v. Porter*, 213 Mich.App. 25, 539 N.W.2d 523 (1995); *Harwood v. Auto-Owners Ins. Co.*, 211 Mich.App. 249, 535 N.W.2d 207, 209 (1995). In this case, PAS has filed insufficient evidence to create a genuine issue of material fact as to mutual mistake. SCS is entitled to summary judgment on Count XI as a matter of law.

### 7. Failure to Provide Required Notice

 SCS has argued that eight of PAS's claims for additional compensation (claims U2–5–001, U3–5–002, U3–5–004, U3–5–005, U3–5–008, U1–2–004, U1–2–014,

and U1–2–018) must be rejected under Section 47 of the General Requirements and under Sections 23 and 24 of the Subcontract which required notice (and prior approval) as to requests for payment of additional work.

Given the contentious and confusing history of the parties' letters campaigns and the completion of the "additional" work, there are genuine issues of material fact which must be resolved by jury, including whether the required notices were timely sent, whether the notices sent were sufficient in light of the parties' other communications, and whether the notice requirement was waived by assent or conduct of SCS. SCS's Motion is denied in this respect.

### B. BWL's Motion for Partial Summary Judgment

BWL has joined in SCS's Motion for Partial Summary Judgment and has requested that the Court grant it partial summary judgment. The Court interprets this Motion as a request by BWL for partial summary judgment as to those counts of the Second Amended Complaint as to which BWL and SCS were jointly named and as to which SCS sought summary judgment in its Motion for Partial Summary Judgment: Count VII (*quantum meruit*); Count VIII (express warranty); and Count IX (implied warranty).

A review of the additional briefing in connection with BWL's Motion necessitates no additional substantive comment (given the essential identity of the legal issues) and warrants like treatment. Namely, BWL's Motion will be granted as to Count VIII and denied as to Counts VII

---

7. Champagne also noted that SCS did not demand the flyash removal until after "final approval" as to asbestos abatement. However, no party has made any sufficient legal argument that this "final approval" had any legal effect in suspending or otherwise modifying PAS's duty to remove flyash.

and IX. The reasoning for this disposition is stated above.

### C. PAS's Motion for Partial Summary Judgment against BWL

PAS has also moved for partial summary judgment against BWL on Count III (implied warranty to disclose superior knowledge) on the ground that the disclosures it allegedly made cannot as a matter of law constitute sufficient disclosures under the contract and the law. This Motion must also be denied. Were it true, as Michael Ring contended, that he had informed bidders that additional documents were available for review at BWL's offices and given the contract language which similarly advised bidders, then a jury could properly find in BWL's favor that the contractual duties to disclose superior knowledge had been met. Accordingly, the Motion is denied because there are genuine issues of material fact.

### D. PAS's Motion for Partial Summary Judgment against SCS

PAS has also filed a motion for partial summary judgment as to SCS's counter-claim against it. This Motion raises the narrow legal issue of whether SCS is entitled to special, incidental and consequential damages on its counter-claim given the limitation expressed in the Subcontract, Amendment B.[8] SCS has opposed this Motion on essentially legal grounds.

SCS's opposition makes the following legal contentions: (1) that the question of whether damages are special, incidental or consequential damages is a factual issue for the jury to decide; (2) that the loss of productivity and delay damages claimed are not "special, incidental, or consequen-

tial damages" under Michigan law; (3) that the contract language did not intend a limitation of delay damages as to SCS in that PAS reserved the right to seek delay damages under the Subcontract.

 Simply put, SCS is mistaken as to each of its assertions. On the question of whether the classification of damages is a legal issue under Michigan law, SCS has cited no sufficient persuasive authority, and certainly no controlling authority, for the proposition that the jury should decide this question. To the contrary, several cases interpreting Michigan law have held that the classification of damages is a legal issue for the courts. In *Firwood Manufacturing Co. v. General Tire, Inc.*, 96 F.3d 163 (6th Cir.1996), the Sixth Circuit Court of Appeals held, as a matter of law, that lost interest was a non-recoverable item of damage under Michigan's Uniform Commercial Code, which allows "incidental" but not "consequential" damages. In *Island Creek Coal Co. v. Lake Shore, Inc.*, 832 F.2d 274, 278 (4th Cir.1987), the Fourth Circuit Court of Appeals, applying Michigan law, held as a matter of law that a contract clause limiting "consequential damages" was enforceable and limited the plaintiff's recovery to direct damages. *Compare Kvaerner U.S., Inc. v. Hakim Plast Co.*, 74 F.Supp.2d 709 (1999) (stating under Michigan law that an inconspicuous limitation of consequential damages clause, as between merchants, was enforceable as a matter of law *until waived by modification of the contract*). Accordingly, the Court determines that this issue is to be decided as a matter of law.

 Second, the Court rejects the proposition asserted by SCS that its "delay

---

8. It is clear that SCS is seeking such damages given that its calculation of damages is based on the Report of George Robinson. Robinson in his Report included within his calculation such items as the lost value of salvage materi- als (fluctuation in market price) caused by delay in completion of the project, the cost of idle equipment caused by delay, and other delay and loss of productivity damages.

damages" are not excluded by the limitations in paragraph 7. The citations and interpretations made by SCS to reach this conclusion are not persuasive to this Court. SCS's opposition is answered by several holdings of the Sixth Circuit Court of Appeals regarding Michigan law. In *Ruggles v. Buffalo Foundry & Machine Co.*, 27 F.2d 234, 235 (6th Cir.1928), the Sixth Circuit Court of Appeals, applying earlier Michigan holdings, determined the distinction between "general" and "special damages" as follows:

> The distinction between general and special damages is not that is one and the other is not the direct and proximate cause of the breach complained of, but that general damages are such as naturally and ordinarily follow the breach, whereas special damages are those that ensue, not necessarily or ordinarily, but because of special circumstances. *Lawrence v. Porter*, 63 F. 62 (6 C.C.A.); *Lillard v. Warehouse Co.*, (6 C.C.A.) 134 F. 168; *Howard Supply Co. v. Wells*, (6 C.C.A.) 176 F. 512.

*Ruggles*, 27 F.2d at 235. The *Ruggles* Court then went on to hold that because one would not necessarily expect an evaporator (which was the subject of the contract) to run in tandem with a second evaporator that losses for the non-use of the second evaporator were "special damages" which were excluded by a term of the contract. *Id.*

While the decision in *Ruggles* is of sufficient vintage to call into question its continuing validity, a survey of other Michigan decisions reveals that Michigan law still recognizes the distinction between "special" and "general" damages and still attaches some importance to this distinction in certain contexts. In the more recent case of *Kratze v. Independent Order of Oddfellows*, 442 Mich. 136, 500 N.W.2d 115 (1993), the Michigan Supreme Court held that it still distinguished in trespass cases between general damages (for loss of value

of property), which are presumed, and special damages (including claims for lost employee wages and the cost of a second land survey), which must be specifically pled and proven. Other Michigan cases and federal cases interpreting Michigan law recognize this same distinction. In *Reed v. Rustin*, 375 Mich. 531, 134 N.W.2d 767 (1965), the Michigan Supreme Court recognized that general damages were recoverable for a breach of a covenant against encumbrances, but that "special damages" including damages for materials in making subsequent improvements were not recoverable. In *American Vitrified Products Co. v. Wyer*, 221 F.2d 447, 450–51 (6th Cir.1955), the Sixth Circuit Court of Appeals held that under Michigan law lost profits, overhead, and costs of maintaining equipment as to a construction contract were recoverable "special damages" when they were within the contemplation of the parties and were not excluded by the contract. In *American National Bank v. Barley*, 219 Mich. 482, 189 N.W. 22 (1922), the Michigan Supreme Court similarly determined that losses on resale upon a breach of a contract were "special damages." Accordingly, the Court determines that the various kinds of delay damages claimed by SCS (*i.e.*, loss of value of resale, idled equipment, loss of efficiency, *etc.*) are "special, incidental and consequential damages" within the meaning of paragraph 7 and Michigan law.

Finally, SCS argues that this limitation does not apply to its damages because paragraph 5 created an exception for "delay damages" sought by either party. This construction of paragraph 5 does violence to its clear wording and intent. Paragraph 5 was clearly intended to permit delay damages, under the specified circumstances, *when sought by PAS*. There is no indication in the language that SCS was intended to be benefitted by this language or that SCS would have some

additional right to sue by virtue of this paragraph. Accordingly, the Subcontract language, including paragraphs 5 and 7, can be given its full and intended effect without excusing SCS from the limitations in paragraph 7. The notion that this is an illogical construction of the contract merely because it does not favor SCS is not true. Since the burden of the construction work at issue was placed by the Subcontract on PAS, it was logical to expect that PAS would have greater rights than SCS under the contract to seek delay damages.

Therefore, PAS's Motion for Partial Summary Judgment will be granted and summary judgment shall enter in PAS's favor as to the portion of SCS's counter-claims seeking "special, incidental and consequential" damages.

### VII. CONCLUSION

In accordance with this Opinion, SCS and BWL's Motion to Dismiss Certain Claims without Prejudice will be granted; SCS's Motion for Partial Summary Judgment shall be granted in part and denied in part; BWL's Motion for Partial Summary Judgment will be granted in part and denied in part; PAS's Motion for Partial Summary Judgment against BWL will be denied, and PAS's Motion for Partial Summary Judgment as to counter-claims of SCS will be granted. An Order and Partial Judgment shall issue consistent with this Opinion.

### ORDER AND PARTIAL JUDGMENT

In accordance with the Opinion of this date;

**IT IS HEREBY ORDERED** that Defendants SCS Group, L.C., Lansing Board of Water and Light, and International Fidelity Insurance Company's Motion to Dismiss Certain Claims without Prejudice (Dkt. No. 256) is **GRANTED** and said parties' cross-claims against one another are **DISMISSED** without prejudice.

**IT IS HEREBY ORDERED** that Defendant SCS Group, L.C.'s Motion for Partial Summary Judgment (Dkt. No. 264) is **GRANTED IN PART AND DENIED IN PART.** Summary Judgment is entered in SCS Group, L.C.'s favor as to Counts VI, VIII and XI of the Second Amended Complaint; otherwise the Motion is denied.

**IT IS FURTHER ORDERED** that Defendant Lansing Board of Water and Light's Motion for Partial Summary Judgment (Dkt. No. 273) is **GRANTED IN PART AND DENIED IN PART.** Summary judgment is entered in Defendant Lansing Board of Water and Light's favor as to Count VIII; otherwise, the Motion is denied.

**IT IS FURTHER ORDERED** that Plaintiff Performance Abatement Service's Motion for Partial Summary Judgment against Defendant Lansing Board of Water and Light (Dkt. No. 269) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff Performance Abatement Service's Motion for Partial Summary Judgment as to the counter-claims of Defendant SCS Group, L.C. (Dkt. No. 265) is **GRANTED** and summary judgment is issued in favor of Performance Abatement Service as to those portions of SCS Group, L.C.'s counter-claims seeking special, incidental or consequential damages.